STATE OF CONNECTICUT *v.* JOHN E. VITALE, JR.
(10522)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued June 11—decision released September 10, 1985

*Joseph G. Bruckmann,* assistant public defender, with whom were *Joette Katz,* public defender, and, on the brief, *Temmy Ann Pieszak,* assistant public defender, for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom, on the brief, were *Dennis A. Santore,* state's attorney, and *Erin M. Kallaugher,* law student intern, for the appellee (state).

CALLAHAN, J. On September 18, 1978, a grand jury for Litchfield county indicted the defendant, John E. Vitale, Jr., and three codefendants, Stanley Chenkus, Joseph LeBlanc and James Calca, for two counts of felony murder in violation of General Statutes § 53a-54c[1] in connection with the deaths of Bruce M. Gilbert and Henry J. Kulesza. The defendant pleaded not guilty to both counts of the indictment and elected to be tried by a jury, as did James Calca. Chenkus and LeBlanc entered into plea negotiations with the state, pleaded guilty to reduced charges of conspiracy to commit robbery and testified at the trial of the defendant and Calca. The trial resulted in a hung jury and the declaration of a mistrial. Subsequently Calca changed his plea.

The defendant was tried a second time alone, and on August 8, 1980, a jury found him guilty of both counts of felony murder charged in the indictment. Chenkus and LeBlanc testified again at the second trial. On September 19, 1980, the trial court sentenced the defendant on each count of the indictment to consecutive terms of not less than twelve years to life imprison-

---

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

ment, thereby imposing an effective sentence of not less than twenty-four years to life.

The defendant has appealed claiming: (1) a violation of his constitutional right to confront the witnesses against him; (2) error in an evidentiary ruling by the trial court; (3) error in the trial court's refusal to charge the jury on larceny in the fourth degree as a lesser included offense of felony murder; (4) a violation of his fifth and sixth amendment rights under the federal constitution by the admission into evidence of statements the defendant made to a correction officer; and (5) the denial of effective assistance of counsel. We find no error.

The jury could reasonably have found the following facts. On the afternoon of May 3, 1978, the bodies of Bruce Gilbert and Henry Kulesza were found in their combination home-antique shop in Woodbury. Gilbert was lying dead on the kitchen floor. His death was attributed to stab wounds of the abdomen. Kulesza's body was discovered at the foot of a set of stairs. His death was caused by multiple fractures of the skull and stab wounds of the chest. Death in both instances had occurred the previous night. The premises were in disarray, and the upstairs rooms, one of which contained a safe, appeared to have been ransacked.

In the early evening of May 2, 1978, Joseph LeBlanc and James Calca, while at Calca's home in Waterbury, made plans to commit a burglary that night. They made several telephone calls and enlisted the aid of the defendant and Stanley Chenkus. The four men left Waterbury and rode to Southbury in a Ford station wagon driven by the defendant, looking for a place to burglarize. Unable to accomplish their purpose in Southbury, they left and eventually arrived in Woodbury at the home of the victims. The defendant went to the back door and, on the pretext that he wished

to use the telephone, was admitted to the house. He returned to the car in about twenty to twenty-five minutes and told the others that two gay men lived there, that they were drunk, and that one was going to bed and the other wanted the defendant to return in about thirty minutes. The four went to a restaurant for coffee, but found it closed and drove back to the victims' house.

When they returned to the house, the defendant entered first, followed by Calca. Chenkus and LeBlanc remained outside, smoking marijuana. Once inside, Calca grabbed Gilbert and demanded the combination to the safe. Gilbert started to yell and was assaulted with karate blows by the defendant. The defendant then met Kulesza coming down the stairs and knocked him to the floor.

The defendant ran out of the house and told Chenkus and LeBlanc to come inside. When they entered the house, the defendant first told Chenkus to tie up Gilbert, then told him to go upstairs to look for money. While Chenkus, LeBlanc and Calca were upstairs ransacking the rooms and prying open a safe, the defendant stabbed Kulesza. He then joined the others in looting the safe. Calca went downstairs, followed shortly by the others, who met Calca coming from the kitchen. Gilbert was dead in the kitchen.

The four left and returned to Waterbury in the Ford station wagon driven by the defendant. On the way, Calca disbursed the proceeds of the robbery, giving each participant approximately $1200 in cash. The four also split one hundred silver dollars. The defendant said that each could keep whatever jewelry he had stolen.

On the afternoon of May 4, 1978, the defendant purchased a motorcycle from Family Cycle in Waterbury. The purchase price of $1189 plus the sales tax was paid in cash by the defendant.

On May 15, 1978, the state police found a jewelry box and a set of cameo cuff links beneath the driver's seat of a 1973 Ford station wagon which was registered to the defendant's grandmother. The car had been seized pursuant to a search warrant on May 11, when the defendant was arrested. It had been parked on a public street near the Walking Man Cafe in Waterbury, where the defendant was taken into custody. The jewelry box and cuff links were identified as belonging to the victim Kulesza.

The defendant testified at his trial. His testimony was markedly different from that of Chenkus and LeBlanc, who testified as to the defendant's extensive and direct involvement in the crimes. In summary, the defendant testified that he did drive the car on the night of May 2, 1978, but that he thought he was transporting the other three to a drug transaction. He testified that he was directed to the victims' home and was ordered to stay in the car as a lookout while the others exited from the car and approached the house. He believed that they were making the drug deal. He then heard yelling and entered the house by an open back door. Upon entering the house, he saw a man lying on the kitchen floor with blood coming from his mouth. He then met Calca, who ordered him into the house. He observed a second man with a cut on his head lying naked at the foot of the stairs.

The defendant testified further that he was told to accompany LeBlanc upstairs where the others were looking through rooms and trying to open a safe in one of the bedrooms. The defendant testified that he wanted to leave the house and went downstairs, but that Calca told him to go back upstairs.

The defendant denied having injured either Kulesza or Gilbert, or asking anyone else to harm them. In fact, he denied touching them. According to the defendant,

his only purpose that night was to give LeBlanc, Chenkus and Calca a ride to a drug deal, and he had nothing to do with searching the house, robbing the safe, or stealing anything from the house. The defendant's testimony was consistent with the elements of an affirmative defense to felony murder under General Statutes § 53a-54c.[2]

## I

The defendant first claims that the trial court restricted his cross-examination of Stanley Chenkus, in violation of his right of confrontation under the sixth amendment to the federal constitution. Having cross-examined Chenkus at length, the defendant attempted to question him concerning possible criminal activity, particularly burglaries, in which Chenkus may have participated with Joseph LeBlanc prior to May 2, 1978. The trial court sustained a general objection to this line of questioning on the ground that it was not probative of veracity. The defendant duly excepted.

A defendant's right to cross-examine witnesses is not absolute and is subject to reasonable limitation. *State v. Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983). Whether to permit cross-examination as to particular acts of misconduct to show a lack of veracity lies largely within the discretion of the trial court. *Vogel* v. *Sylvester,* 148 Conn. 666, 675–76, 174 A.2d 122 (1961). Chenkus had already been extensively cross-examined at the time of the inquiry concerning his prior criminal activity with LeBlanc. He had admitted having been arrested for prior criminal charges, including burglary. Had the evidence of prior misconduct been offered on the issue of veracity, it would not have been an abuse of the trial court's discretion to sustain the objection.

The defendant contends, however, and the state concedes, that the court misunderstood the purpose for

---

[2] See footnote 1, supra.

which the evidence was offered and consequently based its ruling on irrelevant grounds. It is sufficiently clear from the record that the purpose of the offer was not to attack directly Chenkus' veracity, but rather to show a relationship between Chenkus and LeBlanc which involved their joint participation in burglaries prior to May 2, 1978. The defendant in his brief contends that had he been allowed to pursue this line of inquiry, it "could have provided independent evidence that because at least two of the codefendants engaged in other burglaries together, possibly establishing a modus operandi, it is more likely than not they had planned the Gilbert home burglary together, to the exclusion of [the defendant]." He further asserts that "[a] history of previous burglaries could have been used to refute Chenkus' testimony geared to show that [the defendant] was the instigator of the break-in," and he claims that the ruling of the court denied him the opportunity "to plant the seed of his defense."

The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge. This discretion comes into play, however, only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 435 A.2d 1022 (1980). The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness. *United States* v. *Vasilios,* 598 F.2d 387, 389 (5th Cir. 1979); *State* v. *Castro,* supra, 425.

Cross-examination regarding motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Corley,* 177 Conn. 243, 246, 413 A.2d 826 (1979). We note, however, that the theory upon

which the defendant offered evidence of Chenkus' prior misconduct involved none of these factors. The purpose of the defendant's questions was to elicit substantive evidence of a possible prior relationship involving criminal activity between Chenkus and LeBlanc that might bolster the defendant's version of the incident of May 2, 1978.

It is clear from the record that the defendant was allowed wide latitude to cross-examine Chenkus. The defendant brought out, among other things, that Chenkus had made numerous inconsistent statements, that he was a chronic abuser of drugs and alcohol, that he had discussed the case with LeBlanc, and that he had received a very favorable plea bargain in exchange for his testimony. Under the circumstances, we cannot conclude that the defendant was denied his sixth amendment right of confrontation. Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. In this instance, the defendant has put a constitutional tag on a nonconstitutional claim. *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982).

It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *Jones,* 167 Conn. 228, 233, 355 A.2d 95 (1974); *Casalo* v. *Claro,* 147 Conn. 625, 630, 165 A.2d 153 (1960). The defendant has not directed this court to any evidence in the record which would indicate the specific type of criminal activity in which Chenkus and LeBlanc may have participated together prior to May 2, 1978. We therefore cannot determine if there was in fact prior criminal activity involving Chenkus and LeBlanc, evidence

of which might have been beneficial to the defendant. The only relevant reference contained in the record is a colloquy between the trial court and defense counsel in which defense counsel stated, "Your honor, based on the last trial where Mr. Chenkus at that time did take the Fifth Amendment in regard to similar questions, we have reason to believe that based on that that during this prior month there *may have been* other incidents *perhaps* of a similar nature involving these [Chenkus, Calca and LeBlanc] three parties." (Emphasis added.) Since this line of inquiry may have been relevant to the defendant's affirmative defense, the trial court should have allowed the defendant to pursue it. We find this error to be harmless, however, in light of the other evidence introduced at trial through which the defendant was able to "plant the seed of his defense."

There was testimony that Chenkus and LeBlanc were friendly prior to May 2, 1978; that LeBlanc had an extensive felony record, including a conviction for robbery with violence and four convictions for breaking and entering; that Chenkus had been arrested several times, at least once for burglary; and that the defendant had no arrest record. There was also testimony that LeBlanc and Calca initiated the plans for a burglary on May 2, 1978, that Chenkus agreed to participate in the burglary, and that Calca, in LeBlanc's presence, made several telephone calls to secure a car before the defendant agreed to transport them. This was evidence from which the jury could have inferred that the defendant was not an "instigator" in the incident of May 2, 1978.

We cannot, under the circumstances of this case, say that the court's ruling was probably harmful or clearly prejudicial to the defendant. *State* v. *Shindell,* 195 Conn. 128, 141, 486 A.2d 637 (1985).

## II

The defendant next claims that the trial court abused its discretion by refusing to allow into evidence testimony of Francine LeBlanc, the former wife of Joseph LeBlanc, concerning a statement she made and Joseph LeBlanc's reaction to that statement. The defendant claims that this evidence would have established an unintended admission by conduct, lending support to the defendant's assertion of an affirmative defense to felony murder.

In an offer of proof outside the presence of the jury, Francine LeBlanc testified that she had said in the presence of Joseph LeBlanc, "I couldn't let the baby grow up knowing that his father was a murderer or someone might tell him or would ridicule him that his father killed someone." She also testified that "Joe didn't answer to this and he just left."

The defendant claims that Joseph LeBlanc's silence in the face of his wife's statement was an admission and reflected a consciousness of guilt. He argues that this silence, though communicative, was nonassertive conduct falling outside the hearsay rule. *State* v. *McCarthy,* 197 Conn. 166, 173, 496 A.2d 190 (1985). Even if the evidence offered was determined to be outside the hearsay rule, however, the conduct would have to be a reliable indicator of what the defendant claims it tended to communicate before such evidence could be admitted. "Although evidence of silence in the face of an accusation may be admissible under the ancient maxim that 'silence gives consent' the inference of assent may be made only when no other explanation is equally consistent with silence. *State* v. *Bates,* 140 Conn. 326, 328, 99 A.2d 133 (1953)." *State* v. *Harris,* 182 Conn. 220, 229, 438 A.2d 38 (1980).

Some of the considerations in determining the proper explanation for an actor's silence are whether the circumstances show that the actor heard, understood, and comprehended the statement to which he did not respond, and whether the circumstances naturally called for a reply from him. *State* v. *Ferrone,* 97 Conn. 258, 265–66, 116 A. 336 (1922). Here there was no showing of the circumstances under which Mrs. LeBlanc's comment was made, what the emotional state of the parties was at the time, or even that Joseph LeBlanc heard it. Certainly there was no evidence that the circumstances naturally called for a reply from Joseph LeBlanc. The court therefore did not err in excluding Mrs. LeBlanc's testimony.

Further, Joseph LeBlanc testified at length concerning his participation in the incident that resulted in the death of the victims. Since there was no doubt that LeBlanc was involved, any display of consciousness of guilt on his part would necessarily be so ambiguous in its meaning as to have little relevancy to the defendant's affirmative defense. The defendant has thus failed to demonstrate that the court's ruling was probably harmful to him. *State* v. *Briggs,* supra.

## III

The defendant requested a jury instruction on larceny in the fourth degree; General Statutes § 53a-125;[3] as a lesser included offense of felony murder. The trial court refused to charge the jury as to larceny in the

[3] In 1978, when the crimes with which the defendant was charged occurred, General Statutes § 53a-125 provided as follows: "Sec. 53a-125. LARCENY IN THE FOURTH DEGREE: CLASS C MISDEMEANOR. (a) A person is guilty of larceny in the fourth degree when the value of the property or services is fifty dollars or less.

"(b) Larceny in the fourth degree is a class C misdemeanor."

Under General Statutes § 53a-121 (a) (3), "[w]hen the value of property or services cannot be satisfactorily ascertained pursuant to the standards set forth in this section, its value shall be deemed to be an amount less than fifty dollars."

fourth degree and the defendant duly excepted. The defendant contends that there was evidence from which the jury could reasonably have found that his part in this incident was other than as a participant in the felony murders or the underlying robbery. Further, he claims that the requested charge of larceny in the fourth degree met all the criteria of *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980), and that therefore the trial court erred in refusing to instruct the jury as requested. *State* v. *Falby,* 187 Conn. 6, 444 A.2d 213 (1982).

The defendant claims in his brief that the jury was entitled to believe certain portions of his testimony and certain portions of the testimony of other witnesses. From that testimony, the defendant argues, the jury could have found that on the night of May 2, 1978, the defendant stole property of undetermined value belonging to the victims, but that no force or threat of force was used to accomplish the theft. Therefore, he claims, there was evidence from which the jury could have found him not guilty of felony murder and not guilty of robbery, but guilty of larceny in the fourth degree as a lesser included offense of felony murder. We disagree.

The evidence to which the defendant refers can be briefly summarized as follows. There was testimony that a jewelry box and cuff links of undetermined value which belonged to one of the victims were found in the Ford station wagon that the defendant was using on May 11, 1978, the night he was arrested. There was also testimony that while the four men were in the house, the defendant took a bank envelope or sack and handed it to Calca, and there was no evidence of the value of its contents. The defendant testified that when he went into the Gilbert-Kulesza home, the two victims were already unconscious and he did not in any way participate in the harm inflicted on them. Although the

defendant denied in his testimony that he took anything from the house, he maintains that the jury was entitled to find that he did, in fact, commit a larceny of property of undetermined value, but that the larceny was accomplished without the use or threatened use of force.

Under the circumstances as alleged by the defendant, he would be entitled to be found not guilty of felony murder and not guilty of robbery, but he would not be entitled to a jury instruction on larceny in the fourth degree. The defendant's request was for a charge concerning his culpability for a separate and distinct crime, that is, a charge as to an alternate offense, not a lesser included offense.

The defendant does not dispute that these two felony murders occurred. Rather, his claim is that he had no part in the murders or in the robbery, that is the larceny by force, which was the predicate felony. Any larceny, other than a larceny accomplished by the use of the force resulting in the deaths of the victims, would not, under the circumstances of this case, be a lesser included offense of felony murder, but simply an unrelated larceny. A larceny not related to the robbery, even though committed the same night, is a separate crime and not a lesser included offense of these felony murders. The defendant was not entitled to a jury instruction on a separate uncharged crime. See *State v. MacFarlane*, 188 Conn. 542, 548–49, 450 A.2d 374 (1982).

## IV

The defendant next claims that the trial court erroneously admitted into evidence a conversation he had with James Fortin, a correction officer at the Bridgeport correctional center. The defendant contends that the conversation with Fortin was custodial interrogation, and that prior to that conversation he was not given

timely *Miranda* warnings and he did not waive his *Miranda* rights. See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant also claims that the statements he made during his conversation with Fortin were obtained in violation of his sixth amendment right to counsel.

The defendant's claims have validity only if he was in fact subjected to custodial interrogation. *Rhode Island* v. *Innis,* 446 U.S. 291, 298, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *State* v. *Stankowski,* 184 Conn. 121, 136–38, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). Further, the defendant has the initial burden of showing that his conversation with Fortin was custodial interrogation. *United States* v. *Charles,* 738 F.2d 686, 695 n.11 (5th Cir. 1984); *United States* v. *De La Fuente,* 548 F.2d 528, 533 (5th Cir. 1977).

The state concedes that, at the time of his conversation with Fortin, the defendant was in custody for the purposes of *Miranda,* and that Fortin was a law enforcement officer. The state maintains, however, that the defendant was not subjected to interrogation. We agree.

From the evidence adduced at a suppression hearing outside the presence of the jury, the trial court could reasonably have found the following facts: After his arrest on these two counts of felony murder, the defendant was confined in lieu of bond at the Bridgeport correctional center. While in his cell, he had a conversation with James Fortin, a uniformed correction officer. This conversation took place at the beginning of June, 1978, shortly after the defendant had been brought into the correctional center. There was another person approximately four feet away when this conversation took place. At the time, Fortin had been a

correction officer for approximately a year and two or three months. Fortin talked to all the inmates at the correctional center.

Fortin and the defendant had attended the same high school in Waterbury. Fortin knew the defendant; they had played football together. Fortin started a general conversation with the defendant. They talked about "high school and playing football and things" and the defendant was telling him "different things" when the conversation "turned over" to why the defendant was arrested. During the conversation, the defendant made the inculpatory statements in question.[4]

At the time of the conversation, Fortin was aware that the defendant was confined in lieu of bond on two counts of felony murder. Fortin took no notes of the conversation. Sometime later in the month of June, Fortin talked to his uncle, Thomas Gugliardi, at a graduation or christening party. Gugliardi was a state policeman assigned to the Litchfield barracks and was an investigating officer on the Gilbert-Kulesza murders. At the party, Fortin told his uncle about his conversation with the defendant and Gugliardi asked if he would

---

[4] At the suppression hearing Fortin testified as follows: "We were talking about high school and playing football and things. Turned over to why he was arrested. And he told me he was up to the house in Woodbury prior to that night up at a party and they went back that night to commit a burglary. And things got carried away and they ended up killing them with a butter knife. John said he was covered with blood on his clothes and his sneakers and he knew it was just a matter of time before they arrested him, but the cops couldn't prove that he did it."

At trial his testimony was: "We were talking about going to high school together and playing on the same football team and different conversation concerning that. And he started talking about why he was arrested. And he told me he was up to the Woodbury house prior to that night for a party and they came back that night for a burglary and things got a little bit out of hand and carried away, and they ended up killing them with a butter knife. John said he was covered with blood, his clothes and his sneakers and that he knew he would be arrested, eventually, but the cops couldn't prove that he did it."

talk to a state police detective. Fortin later talked to Detective Paul Reed. It was the first time Fortin had ever reported to the state police or other authorities what a prisoner had said during a conversation. At the time of his conversation with the defendant, Fortin did not know his uncle was an investigating officer in the case.

Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way. *Miranda* v. *Arizona,* supra, 444. Before one suspected of the commission of a crime is entitled to the warnings constitutionally required by *Miranda,* two conditions are required: the suspect must be in the custody of law enforcement officials; *Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Beckwith* v. *United States,* 425 U.S. 341, 344–48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); and the suspect must be subjected to interrogation. *State* v. *Stankowski,* supra, 136.

The state concedes that the defendant was in the custody of law enforcement officials at the time of his conversation with Fortin. The decisive question is whether he was the subject of interrogation.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part

of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original.) *Rhode Island* v. *Innis,* supra, 301–302; *State* v. *Stankowski,* supra, 136–37.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda* v. *Arizona,* supra, 478. " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island* v. *Innis,* supra, 300. Voluntary statements of any kind are not barred by the fifth amendment. *Miranda* v. *Arizona,* supra, 478.

It is clear from the record that the statements in question were not the result of conduct designed to elicit incriminating statements. They were volunteered by the defendant during a general conversation between him and Fortin, wherein the defendant spoke freely about the offenses with which he was charged. Although there is no doubt that the defendant was in custody, his statements were not in response to interrogation. *Leuschner* v. *State,* 41 Md. App. 423, 397 A.2d 622, cert. denied, 444 U.S. 933, 100 S. Ct. 279, 62 L. Ed. 2d 662 (1979).

Because the right to counsel applies only when the government deliberately elicits incriminating information, the defendant's sixth amendment right to counsel was not violated. *United States* v. *Henry,* 447 U.S. 264, 270, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980); *Massiah* v. *United States,* 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

The trial court therefore did not err in refusing to suppress the defendant's statements.

## V

Finally the defendant argues that he was denied the effective assistance of counsel. This argument is based on a claim that defense counsel at trial failed to subpoena readily available hospital and police records which would have cast doubt on the rebuttal testimony of Joseph LeBlanc. While the defendant concedes that "a claim of ineffective assistance of counsel is usually more appropriately a subject of a writ of habeas corpus or a petition for a new trial," he claims that the appellate record in this case supports a finding of ineffective assistance of counsel. We disagree.

An ineffective assistance of counsel claim requires the defendant to show "that trial counsel's performance was not reasonably competent or within the range of ordinary training and skill in the criminal law, and that trial counsel's lack of competence contributed to the defendant's conviction." *State* v. *Rivera,* 196 Conn. 567, 570, 494 A.2d 570 (1985).

On the appellate record before us, we cannot determine that the defendant has met either requirement. We therefore cannot conclude that he was denied effective assistance of counsel.

There is no error.

In this opinion the other judges concurred.