******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STEVEN ROBERT
DURDEK
(AC 40995)

DiPentima, C. J., and Sheldon and Prescott, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of murder, burglary in the
first degree, sexual assault in the first degree, arson in the first degree,
and tampering with physical evidence, the defendant appealed. During
trial, the state's witness, T, testified that the defendant had confessed
the crimes to him. During the state's case-in-chief, T admitted that he
previously had been convicted, as an adult, of larceny and burglary. In
order to impeach T's credibility on cross-examination, defense counsel
sought to introduce evidence that T allegedly had committed certain
other misconduct as a juvenile. The trial court precluded defense counsel
from asking questions about T's juvenile conduct. On appeal, the defen-
dant claimed that the trial court improperly restricted his cross-examina-
tion of T. *Held* that the record was inadequate to review the defendant's
claim that the trial court improperly restricted his cross-examination
of T, the defendant having failed to make an offer of proof regarding
how T would have responded to any question about the alleged miscon-
duct: the defendant had the burden to ensure that the record on appeal
was adequate to review any claim of error raised and, regardless of
whether the defendant's claim was evidentiary or an unpreserved claim
implicating his constitutional rights under the confrontation clause sub-
ject to review under the standard set forth in *State* v. *Golding* (213
Conn. 233), the defendant neither asked the court to permit him to
create a record by questioning T about his alleged juvenile conduct
outside the presence of the jury nor proffered a good faith belief that,
if T were asked whether he broke into his father's house and stole keys
to a vehicle, T would have answered that question affirmatively, and
because this court could not determine on the basis of the record pro-
vided whether allowing the defendant to question T would have resulted
in the admission of any testimony that could have affected T's credibility,
the record was inadequate to evaluate whether the defendant suffered
any harm from the trial court's ruling; moreover, the defendant
impeached T's credibility on cross-examination in a number of other
ways, including highlighting that T originally had been untruthful to the
police by telling them in his initial interview that he had no information
about the crimes, which was in direct conflict with his trial testimony
that the defendant had confessed to T prior to T's police interview, and
that T had not reported the defendant's confession until after the police
began to make inquiries about several stolen watches that they had
connected to T and the defendant.

Argued March 12—officially released September 4, 2018

*Procedural History*

Substitute information charging the defendant with
the crimes of murder, felony murder, burglary in the
first degree, sexual assault in the first degree, arson in
the first degree and tampering with physical evidence,
brought to the Superior Court in the judicial district of
Hartford and tried to the jury before *Kwak, J.*; verdict
and judgment of guilty; thereafter, the court vacated
the conviction of felony murder, and the defendant
appealed. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appel-
lant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with

whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Steven Robert Durdek, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), arson in the first degree in violation of General Statutes § 53a-111 (a) (1), and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[1] The defendant's sole claim on appeal is that the trial court improperly restricted his cross-examination of a state's witness by preventing him, for purposes of impeachment, from asking the witness about misconduct that he allegedly had committed as a juvenile. Because the defendant failed to make an offer of proof regarding how the witness would have responded to any question about the alleged misconduct, we conclude that the record is inadequate to review that claim and, accordingly, affirm the judgment of conviction.

The jury reasonably could have found the following facts. The victim[2] resided in the third floor apartment of a multifamily home on Park Street in Manchester. The victim's apartment had two entrances. One was located on the exterior of the house and could be reached by a fire escape. That entrance opened into the apartment's living room. The second entrance was through an interior door that opened into a hallway near the bedroom and could be reached by a common interior staircase. The defendant lived near the victim, and had walked past the victim's residence on occasion, but never previously had been on or inside the premises or met the victim.

On January 18, 2014, sometime during the early morning hours, the defendant entered the victim's apartment.[3] The defendant found the victim in her bedroom where she lay sleeping and he forced her to engage in vaginal intercourse. He then repeatedly and fatally struck the victim in the head with a ceramic ashtray, causing her to suffer multiple skull fractures. After she died, the defendant poured lighter fluid on her and ignited it in an attempt to destroy evidence of his crimes. The fire caused significant burns to the victim's genital region and face, and destroyed her mattress.

Shortly thereafter, the victim's landlord, who lived in one of the other apartments in the residence, was awoken by a smoke detector alarm. She looked up the interior staircase and saw smoke coming from underneath the victim's interior door. After placing an emergency call, she entered the victim's apartment through the exterior door, which was unlocked, but she was forced to retreat to the exterior staircase landing because of heavy smoke.

First responders began arriving at the residence shortly after 5 a.m. After the fire was extinguished, investigators discovered the victim's badly burned corpse on her bed. The victim was wearing only a single sock and a long sleeve garment that had been bunched up around her shoulders. Between the victim's legs, investigators discovered a partially melted plastic container that was consistent with packaging used to hold igniter fluid for cigarette lighters. A police dog trained to detect accelerants alerted to evidentiary materials taken from the victim's shoulder and groin areas, as well as the victim's bed.

The police collected a number of items of evidence from the crime scene, including a heavy ceramic ashtray, on which it later was determined there were traces of the victim's hair and blood, and two DNA swabs taken from the interior doorknob of the living room door that exited onto the fire escape. During the autopsy of the body, a biological sample was collected from inside the victim's vaginal cavity.

The defendant concedes that the DNA sample collected from the doorknob swabs came from him.[4] The state laboratory tested the doorknob DNA sample and determined that it contained a mixture of DNA from two or more individuals. After comparison with a known DNA sample of the victim's blood collected during the autopsy, the victim was identified as a contributor of some of the DNA. Another contributor was determined to be male and, after comparing the DNA profile of that contributor with those contained in a state database of other unidentified DNA profiles and known DNA profiles from convicted offenders, it was found to match a known profile of the defendant. The known DNA sample of the defendant was then submitted to the state laboratory for additional testing and comparison with the DNA evidence collected in the present case.

The state laboratory determined that the doorknob DNA was consistent with that of the defendant or another male member of his paternal lineage. The expected frequency of individuals other than the defendant who could have been a contributor to the doorknob DNA was less than one in seven billion in the African American, Caucasian and Hispanic populations.

The laboratory also identified the defendant as a contributor to the DNA obtained from the swab of the victim's vaginal cavity, albeit with far less statistical certainty than that attributed to the doorknob DNA. More specifically, the DNA that was detected on the vaginal swab was determined to contain male DNA that consisted of a mixture of sperm-rich cells and epithelial skin-rich cells. That DNA was determined to be consistent with that of the defendant or another member of his male paternal lineage. The random probability that

an individual other than the defendant (or another member of his male paternal lineage) was a source of the DNA material extracted from the skin rich cells was 1 in 1900 in the Caucasian population, 1 in 1100 in the African American population and 1 in 870 in the Hispanic population. The random probability that an individual other than the defendant (or another member of his male paternal lineage) was a source of the DNA material extracted from the sperm rich cells was 1 in 8 in the Caucasian population, 1 in 3 in the African American population, and 1 in 10 in the Hispanic population.

As a result of having obtained the defendant's name in connection with the DNA evidence collected, the police began an investigation of the defendant to determine whether he had any connection to the victim, her family or the location of the murder. No connections were found. The police later obtained a warrant to search the defendant's Facebook records. Those records included a message that the defendant sent at 4:26 on the morning of the murder to a close friend, John Paul Torres, stating, "[y]o, we need to talk, asap." The police also interviewed Torres. Although he provided no useful information during the initial interview, he contacted the police at a later date and disclosed that the defendant had confessed to him that he had killed the victim and set her on fire.

The defendant was arrested and charged by information with murder, felony murder, burglary in the first degree, sexual assault in the first degree, arson in the first degree and tampering with physical evidence. He was tried before a jury, which returned a guilty verdict on all counts. See footnote 1 of this opinion. This appeal followed.

The defendant's sole claim on appeal is that the trial court improperly restricted his cross-examination of Torres by barring the defendant from questioning Torres for impeachment purposes about misconduct that Torres allegedly committed as a juvenile. Although, at its core, the defendant's claim is evidentiary in nature, he also asserts a consequent constitutional violation. Specifically, he argues first that the court abused its discretion by precluding inquiry into Torres' juvenile misconduct on the ground that the evidence was cumulative of his adult convictions of larceny and burglary. He next asserts that the court's improper ruling amounted to an impermissible limitation on his right to confront witnesses as guaranteed by the sixth amendment to the United States constitution, which right necessarily includes an opportunity to expose a witness' motive, interest, bias, or prejudice, and to test the witness' veracity and credibility.[5] See *State* v. *Barnes*, 232 Conn. 740, 746, 657 A.2d 611 (1995); see also *State* v. *Holley*, 327 Conn. 576, 593–94, 175 A.3d 514 (2018) (linking confrontation clause of sixth amendment to

defendant's right to present defense); *State* v. *Leconte*, 320 Conn. 500, 510, 131 A.3d 1132 (2016) (same). The state argues that the defendant's constitutional claim is unpreserved, but that, regardless of whether the defendant's claim is evidentiary in nature or of constitutional magnitude and therefore amenable to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the record is inadequate to review the claim. More particularly, the state argues that because the defendant never made an offer of proof regarding how Torres would have responded if the defendant had been permitted to question him regarding his alleged misconduct as a juvenile, this court is left to speculate whether the court's ruling excluded potentially admissible impeachment evidence that harmed the defendant. We agree that the record is inadequate to review the defendant's claim.

The following additional facts are relevant to our discussion. Prior to the commencement of evidence, the court, *Kwak, J.*, authorized the disclosure of Torres' subpoenaed juvenile arrest records pursuant to General Statutes § 46b-124 (e), and copies were provided to the defendant and the state. The parties were ordered by the court not to disseminate further any information in the juvenile records without the approval of the court. Immediately before Torres was called to testify for the state, the court inquired of the defendant whether he intended to offer any information from Torres' juvenile records. The following colloquy ensued:

"[Defense Counsel]: Basically, Your Honor, it wasn't so much for the record as for the acts themselves that I wanted to question.

"The Court: Which acts?

"[Defense Counsel]: The act of breaking into his father's house in Waterbury stealing keys.

"The Court: So burglary and the theft basically?

"[Defense Counsel]: Burglary and theft.

"The Court: Okay.

"[The Prosecutor]: My objection is to the particulars. First off, on the juvenile records that were received by subpoena and disclosed to us, we don't even have an adjudication. But the specific act, I would indicate that the character of the witness, again, this is admissible for impeachment purposes.

"The Court: Right.

"[The Prosecutor]: And counsel's request again into the particulars, I would claim is not for impeachment purposes but to suggest third-party culpability for which there's not a basis. I would ask the court to consider [Connecticut Code of Evidence §] 6-6 as it speaks to his character and then in the commentary under [§ 6-6 (c)] it gives great discretion in the court to actually

consider whether this extrinsic evidence is something that would actually confuse the jury, have them consider things that are both prejudicial, confusing, and cumulative and it reverts back to the criteria to be considered under [Connecticut Code of Evidence §] 4-3, excluding evidence on those grounds. I would specifically indicate that for that purpose, it just clearly flies afield of what its purpose is. It's not to impeach this defendant for his credibility, but to get into a specific act of misconduct, which has nothing to do with his credibility. His credibility is already established as called into question by two convictions closer in time to his testimony today here. We have a larceny six, which goes to veracity, and a burglary three. The specific acts of conduct I think are misplaced.

"The Court: [Defense counsel].

"[Defense Counsel]: Thank you, Your Honor. We have two recent ones and we have more removed ones by time, but they're consistent in his dishonesty and his dishonesty certainly goes to—

"The Court: Well isn't that cumulative. You can introduce the adult records regarding burglary and larceny which are the same acts that you want to introduce.

"[Defense Counsel]: Not the effect. The cumulative has the effect of showing a continuous pattern of dishonesty as opposed to one mistake or two mistakes.

"The Court: No. I don't think that's—to introduce impeachment purposes, you can show evidence of dishonesty or crimes or felonies and you already have that with the adult records, so I don't see the relevance of the juvenile record[s], which show the exact same thing, it's very cumulative.

"[Defense Counsel]: Again, I wasn't going to ask him specifically about his record, *I was going to ask him had he committed the act* [*of*] *burglarizing his father's house or entering his father's house without permission to steal his father's keys.* And certainly what we have here is a bare record which says, okay, maybe the guy stole something, but what we have back, and I believe it was 2009, not only did he steal something, he steals it from his own father, which really indicates—

"The Court: Well I think a lot of people [steal from] their own families because they believe that they're not going to report them, and, you know, that's the truth, so I don't see the relevance with whether or not he stole from his father. [Prosecutor], anything else?

"[The Prosecutor]: Only that those further questions would really just bear to general character and not character of the truthfulness and for that reason, it shouldn't be allowed.

"The Court: Okay. I'm not going to allow the juvenile records to come in because I believe it is cumulative, you have the adult records, which are more serious, so

you can certainly ask him about those, but not the juvenile records.

"[Defense Counsel]: Very good, Your Honor.

"The Court: All right. Thank you."[6] (Emphasis added.)

The defendant never asked the court to permit him to create a record by questioning Torres about his juvenile records outside the presence of the jury. The defendant also never proffered a good faith belief that, if asked whether he broke into his father's house and stole his keys, Torres would answer that question affirmatively.

The state then called Torres to testify as the final witness in its case in chief. At the beginning of his direct examination, Torres acknowledged in response to the state's inquiry that he previously had been convicted in 2013 of both larceny and burglary. He then subsequently testified about two occasions on which the defendant confessed to having killed the victim. According to Torres, on the first occasion the defendant stated that "he heard some people talking, he went inside through the window, when the door closed the lady came from around the corner and struck him, they got into it, whatever [she] struck him with, he then struck her with and he said there was a wheezing sound and a gurgling and that's when he knew it was finished." The defendant did not mention at that time that he had set a fire or had any sexual contact with the victim.

After Torres was interviewed by the police and learned more details of the murder, Torres confronted the defendant about the murder and the fact that the police were now investigating the defendant. At that time, the defendant indicated that "he went to the window, him and the lady had it out, he beat the lady up, and then he wrapped her in a blanket, threw on the bed and lit her on fire." The defendant again did not describe any sexual contact with the victim. After this second confession, in which the defendant confirmed to Torres that he had set fire to the victim's body, Torres decided to contact the police because "it could have been some lady off the street, it could have been my daughter, it could have been anybody."

Although the court's ruling barred him from questioning Torres regarding the acts set forth in his juvenile records, the defendant nevertheless impeached Torres' credibility on cross-examination in a number of other ways. For example, he highlighted the fact that Torres originally had been untruthful to the police by telling them in his initial interview that he had no information about the murder, which was in direct conflict with his trial testimony that the defendant had confessed to him about the murder prior to his interview. The defendant also forced Torres to admit that he had not reported the defendant's confession until after the police began to make inquiries about several stolen watches that they had connected to Torres and the defendant.

The defendant further highlighted a number of factual inconsistencies between Torres' trial testimony and his prior statements to police. Finally, the defendant was not precluded from revisiting Torres' adult criminal convictions that he disclosed on direct examination, and, although he was not asked about those convictions on cross-examination, the defendant raised them during his closing argument.[7]

"In determining the relevancy and admissibility of evidence, trial courts have broad discretion. . . . Our standard of review of an evidentiary ruling is dependent on whether the claim is of constitutional magnitude. If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Otherwise, in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted.) *State* v. *Swinton*, 268 Conn. 781, 797–98, 847 A.2d 921 (2004). As the appellant, the defendant also has the burden to ensure that the record on appeal is adequate to review any claim of error raised. See Practice Book § 61-10; *State* v. *James L.*, 26 Conn. App. 81, 84, 598 A.2d 663 (1991). If a constitutional claim was not preserved at trial, a party may be afforded appellate review only if "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third prong).

Accordingly, regardless of whether the defendant is attempting to raise a properly preserved claim or seeks review under *Golding*, he undisputedly has the burden of providing this court with an adequate record to review his claim. It is axiomatic that this court will not resort to speculation and conjecture in avoidance of an inadequate record. See *State* v. *Raffone*, 163 Conn. App. 410, 415, 136 A.3d 647 (2016).

In the present case, the defendant claims that the court improperly restricted his cross-examination of Torres by not allowing him to ask Torres whether he had broken into his father's house as a juvenile and stolen his keys. Pursuant to Connecticut Code of Evidence § 6-6 (b) (1), "[a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness."[8] Our courts have held that larceny and burglary

are acts that demonstrate a person's character for untruthfulness. See *State* v. *Crumpton*, 202 Conn. 224, 229, 520 A.2d 226 (1987) ("crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements"); *State* v. *Bailey*, 32 Conn. App. 773, 783, 631 A.2d 333 (1993) (no doubt prior conviction of burglary with larcenous intent bears on credibility of witness). Accordingly, if Torres had admitted to engaging in larceny or burglary as a juvenile, this could have aided the defendant in impeaching his credibility in the eyes of the jury.

Significantly, however, the defendant's questions to Torres about the juvenile misconduct would not themselves have constituted impeachment evidence because "questions are not evidence." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 317, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). Thus, if Torres had denied engaging in the juvenile misconduct or claimed he could not remember doing so, the defendant would have had to accept that answer. See *Demers* v. *State*, 209 Conn. 143, 157, 547 A.2d 28 (1988) ("if on cross-examination a witness denies having engaged in . . . prior acts of misconduct, the examiner must accept the answer and is prohibited from offering extrinsic evidence to prove such acts"). He would not have been entitled to admit the juvenile records or other evidence to prove that Torres engaged in the misconduct because extrinsic evidence to prove specific instances of conduct is inadmissible pursuant to the Connecticut Code of Evidence § 6-6 (b) (2). Accordingly, the only way to evaluate whether the trial court's ruling barred admissible impeachment evidence is to know how Torres would have responded if questioned.

As our Supreme Court recently observed, "the absence or inadequacy of an offer of proof may prevent a criminal defendant from proving on appeal that the trial court's preclusion of certain evidence violated his right to present a defense." (Footnote omitted.) *State* v. *Holley*, supra, 327 Conn. 595–96. The right to confrontation of witness is a component of a defendant's right to present a defense, and, thus, the court's observation in *Holley* is no less applicable in the context of the present appeal.

Moreover, this court previously has rejected for lack of an adequate record a defendant's claim that his right to confront a state's witness was violated where the court is left to speculate how a witness would have answered a question. See *State* v. *Papineau*, 182 Conn. App. 756, 770–72,    A.3d    (2018); see also *State* v. *James L.*, supra, 26 Conn. App. 81.[9] Specifically, in *Papineau*, this court rejected for lack of an adequate record a defendant's argument that the court improperly excluded testimony offered for impeachment purposes. This court observed that the defendant's claim

depended on a record that reflected the substance of the excluded testimony and that the record was "necessary not merely to determine whether the court properly excluded the testimony, *but whether the court's ruling was harmful to the defense.*" (Emphasis added.) *State* v. *Papineau*, supra, 772. The court further explained that "the record does not provide an adequate foundation to support [the defendant's claim]. The defendant easily could have created an adequate record by asking the court to hear [the proposed witness'] responses to the questions outside the presence of the jury. This, however, did not occur." Id. The court concluded that the defendant could not prevail on his claim because it required "speculation as to how a witness might have testified at trial" and "speculation and conjecture . . . have no place in appellate review." (Internal quotation marks omitted.) Id.

In response to the state's argument that the record is inadequate to review the defendant's claim, the defendant makes two arguments, neither of which we find persuasive. First, the defendant argues that if Torres denied engaging in the juvenile larceny and burglary, the juvenile records could have been used to refresh his recollection. Just as we cannot speculate about Torres' response to questions he was never asked, however, we cannot presume that his recollection would have been refreshed by looking at his juvenile records or whether that procedure would have resulted in a change in his testimony.

Second, the defendant argues that under our Supreme Court's decision in *Demers* v. *State*, supra, 209 Conn. 143, he would not have been forced to accept Torres' denial to questions about Torres' alleged juvenile misconduct, but was entitled to have admitted extrinsic evidence regarding the misconduct because Torres' testimony was relevant to a "substantive or material issue in the case." *Demers*, however, is factually and legally distinguishable from the present situation and, thus, not controlling.

*Demers* involved a sexual assault prosecution in which the consent of the victim was at issue. Id., 147–48. Testimony related to consent, therefore, could have aided the jury in deciding an issue directly related to the substantive crime charged. Our Supreme Court in *Demers* held that evidence of a rape victim's prior acts of prostitution should have been disclosed by the state pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) because that evidence was relevant to the issue of the victim's consent and, thus, would have been admissible under a statutory exception contained in our rape shield statute, General Statutes § 54-86f. The court in *Demers* expressly recognized the rule reflected in § 6-6 of the Connecticut Code of Evidence that extrinsic evidence to prove prior misconduct of a witness for purposes of impeachment is

inadmissible. *Demers* v. *State*, supra, 209 Conn. 156–57. The court stated, however, that if "prior acts of misconduct are relevant to a substantive or material issue in the case, the prior acts can be proven by extrinsic evidence, despite the fact that admission of that evidence directly contradicts the testimony of the state's witness, thereby also raising questions as to his or her credibility." Id., 157. In other words, if evidence is otherwise admissible because it directly relates to a jury's ability to evaluate an element of the crime charged or a properly asserted defense, it will not be rendered inadmissible pursuant to the prohibition in § 6-6 against extrinsic evidence simply because it also happens to impeach the credibility of the witness.

The present case does not involve application of the rape shield statute, which was central to the decision in *Demers*. Furthermore, Torres' juvenile misconduct is only relevant to his credibility, not to the jury's consideration of a substantive element of a charged offense or defense. The holding in *Demers* is limited to the unique situation at issue in that case and, to our knowledge, has never been relied upon by an appellate court as a basis for disregarding the clear rule set forth in our Code of Evidence that extrinsic evidence is inadmissible to prove a witness' specific acts of misconduct evidencing a character for untruthfulness. Accordingly, we find no merit in the defendant's reliance on *Demers*.

Returning to the present case, the record reflects that the court precluded the defendant from questioning Torres about specific acts referenced in his juvenile record on the ground that any relevant impeachment evidence would be cumulative of other admissible evidence. At no point during the colloquy with the court on this issue did the defendant ask to make a record by questioning Torres outside the presence of the jury. After the court issued its ruling, the defendant did not press the matter, but simply responded, "[v]ery good, Your Honor." Because the defendant never made an offer of proof by seeking to question Torres on the record outside the presence of the jury as to the answers Torres would have given in response to any questions, the record simply contains no basis for us to evaluate whether Torres would have admitted any of the conduct about which the defendant sought to question him. Because this court cannot determine on the basis of the record provided whether allowing the defendant to question Torres would have resulted in the admission of any testimony that could affect Torre's credibility, the record is inadequate for us to evaluate whether the defendant suffered any harm from the trial court's evidentiary ruling.[10] Accordingly, the defendant's claim necessarily fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of a

victim of sexual assault, we decline to identify the victim. See General Statutes § 54-86e.

[2] At sentencing, the court vacated the felony murder conviction in accordance with *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), and *State* v. *Miranda*, 317 Conn. 741, 120 A.3d 490 (2015). The court then imposed consecutively the maximum term of incarceration for each charge for which the defendant was convicted. The total effective sentence imposed was 115 years of incarceration.

[3] Neither door showed signs of forced entry.

[4] During closing argument, in discussing the doorknob DNA evidence, defense counsel stated as follows: "At the end of January in 2014, the lab got a DNA hit from their data, which included Steven Durdek as a contributor, his DNA on the interior door handle, that was a match, one in seven billion, it was him. Why did they use the number seven billion? It was explained. That's the rough estimate of the population of the planet. DNA is considered unique with the possibility of identical twins. So one in seven billion says yep, it's your DNA. It's your DNA. My DNA, one in seven billion, that's it. Not a lot of arguing there. That was on the door handle."

[5] "It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution. . . . A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . . Furthermore, the sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment. . . .

"In plain terms, the defendant's right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . It guarantees the right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements [of the confrontation clause] of the sixth amendment. . . .

"These sixth amendment rights, although substantial, do not suspend the rules of evidence . . . . A court is not required to admit all evidence presented by a defendant; nor is a court required to allow a defendant to engage in unrestricted cross-examination. . . . Instead, [a] defendant is . . . bound by the rules of evidence in presenting a defense . . . . Nevertheless, exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights . . . . Thus, [i]f the proffered evidence is not relevant [or constitutes inadmissible hearsay], the defendant's right[s] to confrontation [and to present a defense are] not affected, and the evidence was properly excluded." (Citation omitted; internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 593–94, 175 A.3d 514 (2018).

[6] On appeal, the defendant is not always precise about the nature of the evidence that was excluded by the trial court. Although the court stated at the end of the colloquy that it was "not going to allow the juvenile records to come in," that statement must be considered in context. The defendant began the colloquy by indicating unequivocally that he was not seeking to admit the juvenile records into evidence either in whole or in part. Rather he only sought to ask Torres about the conduct that was alleged in those records. The court concluded its ruling by clarifying that it was not going to permit the defendant to ask Torres about his juvenile records. Thus, rather than barring the admission of the records themselves, we construe the trial court's ruling as having barred the defendant's right to question the witness about whether he had engaged in the acts described in the records. Nevertheless, even if the defendant had sought to admit the juvenile arrest records into evidence, they could not have been properly admitted by the court for impeachment purposes because "evidence of an arrest in the absence of a conviction is generally not admissible even to attack credibility." *State* v. *Milner*, 206 Conn. 512, 518, 539 A.2d 80 (1988).

[7] We recite the facts in the previous two paragraphs because they are relevant to whether the defendant's claim on appeal is evidentiary or constitutional in nature, which we address in footnote 10 of this opinion.

[8] Section 6-6 of the Connecticut Code of Evidence provides in relevant part: "(a) Opinion and reputation evidence of character. The credibility of a witness may be impeached or supported by evidence of character for

truthfulness or untruthfulness in the form of opinion or reputation. Evidence of truthful character is admissible only after the character of the witness for truthfulness has been impeached.

"(b) Specific instances of conduct.

"(1) General rule. A witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness.

"(2) Extrinsic evidence. Specific instances of the conduct of a witness, for the purpose of impeaching the witness' credibility under subdivision (1), may not be proved by extrinsic evidence. . . ."

As indicated in the commentary to subsection (b) of § 6-6, the admission of specific instance evidence for impeachment purposes remains subject to the court's discretionary authority regarding the relevancy of evidence, and, therefore, the court must always consider whether the probative value of such evidence is outweighed by undue prejudice, confusion or waste of time, including the "needless presentation of cumulative evidence." Conn. Code Evid. § 4-3.

[9] In *State* v. *James L.*, supra, 26 Conn. App. 81, this court concluded that the record was inadequate to review whether the court properly had precluded the defendant from questioning a sexual abuse victim's mother in an effort to show her bias against the defendant, and that that bias had transferred to the victim, because the defendant had failed to make a sufficient offer of proof regarding whether the defendant previously had threatened to initiate a criminal action against her for the theft of various tools from behind his house. Id., 84–86.

[10] Even if we agreed with the defendant that the record before us is sufficient to review his claim and also that the court improperly prevented him from questioning Torres about the actions described in his juvenile records, the defendant's claim on appeal would nonetheless fail because, given the strength of the state's other evidence independent of Torres' testimony regarding the defendant's confession, he cannot meet his burden of showing that the court's alleged evidentiary error was harmful.

In assessing harmful error, we begin by determining which party has the burden on this question. The answer depends on whether we conclude that the error is of constitutional magnitude, in which case the state has the burden of demonstrating harmlessness beyond a reasonable doubt, or whether the error is merely evidentiary, in which case the defendant has the burden to demonstrate harm. See *State* v. *Peeler*, 271 Conn. 338, 384, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). Although the defendant attempts to frame his claim as one of constitutional magnitude, we are unconvinced that the defendant's claim is more than evidentiary in nature. It is true that a court's decision unreasonably to restrict a defendant's cross-examination of a witness can implicate sixth amendment rights of confrontation if, for instance, the court fails to allow a defendant sufficient latitude to impeach the credibility of an important state witness. In the present case, however, the record shows that the defendant was able to explore multiple avenues of impeachment with Torres, including the opportunity to raise before the jury his prior adult criminal convictions, which, as indicated by the trial court, were more recent and of a similar nature to the excluded alleged juvenile acts. Dressing an evidentiary claim in constitutional garb will not transform its nature. See *State* v. *Rodriguez-Roman*, 297 Conn. 66, 93, 3 A.3d 783 (2010); see also *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985) ("[e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error").

Because we would construe the defendant's claim as evidentiary in nature, he has the burden on appeal of demonstrating not only an evidentiary error but also that the error was harmful. Here, there was compelling and otherwise unexplained DNA evidence that placed the defendant at the scene and in sexual contact with the victim. Furthermore, Torres' testimony regarding the defendant's multiple confessions were independently corroborated by other evidence that would have lessened the impact of any additional impeachment value obtained through an admission of his actions as a juvenile. For example, other witnesses testified that the defendant and Torres were alone together at the times that Torres claimed the defendant confessed to him. There was also testimony that the defendant wanted to speak with Torres alone as well as the Facebook message that the defendant sent to Torres around the time of the murder seeking to discuss something "asap." Torres' testimony that the defendant told him that he entered the victim's apartment through a window was consistent with testimony by first respond-

ers that there was no sign of forced entry with respect to the apartment doors. In other words, given the relative strength of the state's case against him, the defendant simply cannot demonstrate that it is more probable than not that the allegedly erroneous action of the court affected the result of the trial.

———————————————————