******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CHRISTINE DOWNING *v.* EMMANUEL DRAGONE ET AL.
## (AC 44416)

Prescott, Cradle and Suarez, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendants, a used car dealer, D Co., and one of its owners, E, for breach of contract and unjust enrichment. The plaintiff claimed that E and G, D Co.'s other owner, agreed to retain her as an auctioneer for a classic car auction. She further claimed that, at a meeting with E and G, she agreed to provide substantial additional services to assist them in running their first such auction and, in return, they agreed to pay her 1 percent of the gross proceeds of the auction, with a minimum payment in the amount of $30,000. The plaintiff prepared a written agreement memorializing the agreed upon terms, told E that she had done so, and, at his instruction, left it on his desk. The agreement did not contain signature blocks, but it included a provision indicating that, unless rejected, it was to become effective ten days after receipt. Neither E nor G rejected the agreement or attempted to make any changes to it, and the plaintiff performed the services required of her thereunder. After D Co. failed to pay the plaintiff the contracted amount, she initiated the underlying action. At trial, E testified that the plaintiff was hired only to call the auction in exchange for a fee of $2500 plus expenses and claimed that he did not find the written agreement on his desk until several months after the auction was held. The trial court rendered judgment for the plaintiff on her breach of contract claim and for the defendants on the claim of unjust enrichment. On the defendants' appeal, this court reversed in part the judgment of the trial court and remanded the case for a new trial solely on the plaintiff's breach of contract claim. On remand, following a bench trial, the trial court rendered judgment for the plaintiff, and D Co. appealed to this court. *Held*:

1. The trial court's finding that the written agreement was an enforceable contract was not improper:

a. The trial court properly found that D Co. assented to the written agreement by accepting the plaintiff's services thereunder and by failing to object to its terms: the trial court credited the plaintiff's testimony that she discussed with G and E the services that she would perform for the auction, that they agreed her fee would be 1 percent of the gross auction proceeds, with a minimum payment of $30,000, and that she delivered to E a copy of the agreement setting forth those terms; moreover, the trial court found that neither E nor G ever rejected the agreement or attempted to make any changes to it and that they instead accepted the plaintiff's services as outlined in the agreement; furthermore, contrary to D Co.'s arguments, the trial court's findings did not depend on whether the parties discussed the specific terms of the agreement but, rather, on the parties' conduct after the plaintiff delivered the agreement, as evidenced by the plaintiff's testimony, numerous emails between the plaintiff and D Co.'s principals and employees, and the minutes from several weekly meetings held by D Co. in preparation for the auction; accordingly, there was evidence in the record to support the trial court's finding that D Co. had assented to the written agreement.

b. The doctrine of judicial estoppel was inapplicable to D Co.'s claim that the trial court should not have credited the plaintiff's allegedly perjurious testimony: although the plaintiff's responses to the trial court's questioning were equivocal on broad questions, this court disagreed with D Co.'s characterization of her testimony; moreover, D Co. alerted the trial court to the alleged inconsistencies, and, despite this, the trial court credited the plaintiff's testimony that the parties had agreed to the essential terms of the contract and that the plaintiff had memorialized those terms in the written agreement that she delivered to E, and this court declined to second-guess those credibility determinations.

c. This court declined to review D Co.'s claim that the written agreement contained terms that were too ambiguous to meet the certainty require-

ments of an enforceable contract because D Co. failed to raise such claim before the trial court: on appeal, D Co. claimed that the term "gross auction proceeds" as used in the agreement was ambiguous and that expert testimony was necessary for the court to resolve the ambiguity, however, although D Co.'s counsel had questioned the plaintiff at trial regarding her interpretation of the term, D Co. neither requested that the trial court make a determination as to whether the term was ambiguous nor advanced an alternative interpretation of the term and, instead, merely denied that it had agreed to that term in any sense.

d. D Co. could not prevail on its claim that the trial court's finding that the plaintiff testified that she told E she had prepared the written agreement was a gross mischaracterization of the plaintiff's testimony and was clearly erroneous: the trial court's finding was supported by evidence in the record, namely, the plaintiff's testimony and the rational inferences drawn therefrom; moreover, that finding did not depend on whether the plaintiff used the word "agreement" to describe the document that she delivered to E but, rather, on her testimony that she delivered the document to E and told him that it reflected the parties' agreement.

e. Contrary to D Co.'s claim, the trial court did not improperly shift the burden of proof to D Co. to prove that it had not assented to the written agreement but, rather, properly applied the law: although D Co. purported to challenge the burden of proof applied by the trial court, its claim effectively challenged the trial court's factual findings and credibility determinations, and the evidence presented was sufficient to support the court's finding that D Co. had assented to the agreement.

f. D Co. could not prevail on its claim that, because the parties attached different meanings to the plaintiff's actions, there was a legal misunderstanding that precluded enforcement of the written agreement: the trial court found that D Co. had assented to the agreement on the basis of findings that this court held were supported by evidence in the record; moreover, the trial court determined that the plaintiff's version of the events was more credible than D Co.'s version, and this court would not second-guess such credibility determination.

2. D Co. could not prevail on its claim that the trial court improperly admitted hearsay evidence on the issue of damages: to the extent that D Co. claimed that the trial court improperly admitted exhibit 57, a copy of the auction results as reported on the website that was used to hold the auction online, as inadmissible hearsay, this court declined to review the claim because it was not properly briefed and because D Co. failed to object to the admission of the exhibit on that ground at trial; moreover, the plaintiff's testimony with respect to exhibit 57 constituted a sufficient prima facie showing, pursuant to the applicable Connecticut rule of evidence (§ 9-1 (a)), to overcome D Co.'s challenge to its authenticity; furthermore, even if this court assumed, without deciding, that the admission of exhibit 5, a table prepared by the plaintiff that listed the cars sold at the auction and the prices for which they sold, was improper, that evidentiary ruling was harmless because D Co. failed to demonstrate that the exhibit's admission affected the result of the trial.

Argued February 10—officially released November 1, 2022

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, and tried to the court, *Lee, J.*; judgment in part for the plaintiff, from which the defendants appealed to this court, *DiPentima, C. J.*, and *Lavine* and *Pellegrino, Js.*, which reversed in part the judgment and remanded the case for a new trial on the plaintiff's breach of contract claim; thereafter, the case was transferred to the judicial district of Ansonia-Milford; subsequently, the matter was tried to the court, *Hon. Arthur A. Hiller*, judge trial referee; judgment for the plaintiff, from which the defendant Dragone Classic Motorcars, Inc., appealed to this court. *Affirmed.*

*Edward T. Murnane, Jr.*, for the appellant (defendant Dragone Classic Motorcars, Inc.).

*Jeffrey Hellman*, for the appellee (plaintiff).

*Opinion*

SUAREZ, J. In this breach of contract action, the defendant Dragone Classic Motorcars, Inc., appeals from the judgment of the trial court, rendered after a court trial, in favor of the plaintiff, Christine Downing.[1] On appeal, the defendant claims that the court improperly (1) found that a written contract existed between the parties and (2) admitted "hearsay evidence" on the issue of damages. We affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to the defendant's claims on appeal. "The plaintiff . . . is an auctioneer who has been engaged in the auction business since 2003. During the course of her work as an auctioneer, the plaintiff regularly encountered George Dragone (George), one of the two co-owners of the defendant . . . .

"In the summer of 2011, at George's request, the plaintiff met with [George and Emanuel Dragone, the other co-owner of the defendant] at [the defendant's] Westport, Connecticut showroom to discuss the possibility of a classic automobile auction.

"In early 2012, the plaintiff received an email from [Emanuel] stating that [the defendant] planned to hold two auctions in 2012 and wished to retain the plaintiff as its auctioneer. The plaintiff, [Emanuel], and George met on January 26, 2012, to discuss the planning of a May, 2012 auction. At this meeting, George and [Emanuel] agreed to retain the plaintiff to be the auctioneer for [the defendant's] first on-site classic car auction. The parties agreed on the tasks that the plaintiff would perform. Because this was [the defendant's] first auction, the plaintiff's work would require her to do everything . . . [including] branding, creating an on-line presence and help[ing] [to] mold [the defendant] into more of an upper echelon type of name and away from a used car, previously owned car dealership. Additionally, the parties agreed that the plaintiff would be paid 1 percent of the gross proceeds of the auction with a minimum [payment] of $30,000. Before leaving the meeting on January 26, 2012, the parties also agreed that the plaintiff would prepare a written agreement to memorialize the agreed upon terms.

"The plaintiff prepared an agreement, which provides that the plaintiff is to receive 1 percent of the gross auction proceeds, plus expenses, as compensation for her services, with a minimum [payment in the amount] of $30,000.[2] The plaintiff brought the agreement with her to the next meeting with George and [Emanuel] on February 2, 2012. The plaintiff made notes of the February 2, 2012 [meeting] immediately after she left and got into her car. . . .

"At the meeting with George and [Emanuel] at their office on February 2, 2012, the plaintiff showed [Eman-

uel] the agreement describing the terms of her engagement as had been discussed. [Emanuel] told her to leave the agreement on his desk. The plaintiff did so. During the ensuing months leading up to the auction, the plaintiff performed the tasks that the agreement required her to do.[3]

"[Emanuel] admits that he found the agreement on his desk, although he claimed to have found and read it months after the auction. He also claims that the plaintiff's only responsibility was to conduct the auction. These claims are not credible. From the meeting on February 2, 2012, and continuing thereafter, up to and through the date of the auction, the defendant observed and permitted all of the plaintiff's efforts to prepare for and accomplish this auction.

"Over the next several months after the February 2, 2012 meeting, the plaintiff attended numerous meetings to help plan for the auction. Also, as the auction approached, the plaintiff spent more and more time working on the auction, including a trip to Atlantic City, New Jersey, to watch a car auction and working at [the defendant's] reception desk. Overall, the plaintiff worked some hundreds of hours in connection with the auction, advised [the defendant] on the technology required for the auction, established Auction Flex software on [the defendant's] computers, revised [the defendant's] written history for brochures, and helped prepare advertising and marketing materials, revise the auction documents, [and] establish the technical and physical set up for the auction, thereby accomplishing and performing [her] obligations [pursuant to] the agreement. The auction was held on May 19, 2012, and received in excess of $4 milllion in gross receipts. In connection with the auction, the plaintiff incurred expenses of $1340.83." (Footnotes added; footnote omitted.)

After the defendant failed to pay her contractual fee, the plaintiff, as a self-represented party, initiated the underlying action on June 6, 2013.[4] In the operative two count complaint, she asserted breach of contract and unjust enrichment claims against the defendant. After a court trial, the court, *Lee, J.*, rendered judgment for the plaintiff on the breach of contract count and for the defendant on the unjust enrichment count.[5] The defendant appealed, claiming that the court based its legal conclusions on a clearly erroneous factual finding. See *Downing* v. *Dragone*, 184 Conn. App. 565, 570–71, 195 A.3d 699 (2018).

On appeal, this court agreed with the defendant, holding that the court's conclusion that the defendant breached the parties' contract was based on a clearly erroneous factual finding. Id., 574–75. Accordingly, this court reversed in part the judgment of the trial court and remanded the case for a new trial on the plaintiff's breach of contract claim only. Id., 575.

On remand, the case was tried to the court, *Hon. Arthur A. Hiller*, judge trial referee. After the plaintiff rested her case, the defendant moved to dismiss the action pursuant to Practice Book § 15-8 for failure to make out a prima facie case. After hearing argument on the issue, the court issued an order denying the defendant's motion. The court explained that "the parties may be bound by an unsigned contract where [assent] is otherwise indicated. Here, the testimony from the plaintiff's witnesses, if believed, as required by law, is sufficient to indicate the evidence of [assent]."

The trial proceeded thereafter, concluding on January 29, 2020, and the parties filed posttrial briefs. On October 20, 2020, the court issued its memorandum of decision, rendering judgment for the plaintiff. The court found "that there was a written contract between the plaintiff and the defendant and that the defendant breached the contract when it failed to pay the plaintiff for her services." The court awarded the plaintiff damages and interest in the amount of $100,570.54, which included $41,673.20 in damages pursuant to the contract, representing 1 percent of the "gross auction proceeds"; $34,727 in prejudgment interest at a rate of 10 percent per annum; and $24,170.34 in offer of compromise interest at a rate of 8 percent per annum. The defendant filed a motion to reargue, which the court denied without comment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly found that the unsigned written agreement drafted by the plaintiff was an enforceable written contract. We disagree.

In its memorandum of decision, the court reasoned: "[T]he plaintiff testified that on January 26, 2012, the plaintiff met with George and [Emanuel], and they discussed the plaintiff's services that she was to perform and that her compensation would include 1 percent of the gross proceeds from the auction with a minimum payment of $30,000. The plaintiff then prepared a written agreement, which was admitted into evidence as plaintiff's exhibit 1. The written agreement is dated February 2, 2012, and provides that it becomes effective unless rejected within ten days. The agreement also provides that: 'If you want to make any amendments or additions to this agreement, please notify us within 10 days of your desire to do so.' The plaintiff testified that at the next meeting between the plaintiff, [Emanuel], and George, the plaintiff brought the written agreement, told [Emanuel] that she prepared an agreement, held it up to show him, and then was told to place it on his desk. The plaintiff also testified that everything that was in the agreement was discussed with George and [Emanuel] prior to the writing of the agreement.

Neither [Emanuel] nor George ever rejected the agreement or attempted to make any changes or additions. Instead, they accepted the plaintiff's services to plan the auction in accordance with exhibit 1 and did not pay her."

Significantly, although Emanuel testified that the plaintiff's only responsibility was to call the auction and that he did not find the agreement on his desk until several months after the auction, the court found Emanuel's testimony was "not credible." The court noted that, beginning with "the meeting on February 2, 2012, and continuing thereafter, up to and through the date of the auction, the defendant observed and permitted all of the plaintiff's efforts to prepare for and accomplish [the] auction." Accordingly, the court found "that [Emanuel] and George knew that the plaintiff was completing significant tasks related to the auction and that she expected to be paid for her services pursuant to the agreement." On the basis of those findings, the court rendered judgment for the plaintiff.

The defendant's claim that the court incorrectly found that the written agreement was an enforceable contract consists of various subclaims. Specifically, the defendant asserts: (1) "there was no evidence presented of a meeting of the minds or of mutual assent to the alleged contract's terms"; (2) "[t]o the extent that the trial court has credited the plaintiff's obviously perjurious testimony, judicial estoppel should operate to prevent this"; (3) "[t]he alleged contract document contains terms that are too ambiguous to meet the certainty requirements of an enforceable contract"; (4) "[t]he court's finding that the plaintiff testified that she 'told [Emanuel] that she prepared an agreement' is a gross mischaracterization of the plaintiff's actual testimony and clearly erroneous"; (5) the court improperly "shifted the burden of proof to the defendant to prove that the 'written contract' had not been assented to by the defendant"; and (6) because "the parties have attached different meanings to the plaintiff's actions, there has been a legal misunderstanding that precludes enforcement of the document at issue." We address each subclaim in turn.

We begin by setting forth the applicable standard of review. "Whether a contract exists is a question of fact for the court to determine." (Internal quotation marks omitted.) *T & M Building Co.* v. *Hastings*, 194 Conn. App. 532, 538, 221 A.3d 857 (2019), cert. denied, 334 Conn. 926, 224 A.3d 162 (2020).

"In a case tried before the court, the trial judge is the sole arbiter of the credibility of witnesses and the weight to be afforded to specific testimony. . . . [When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the

pleadings in the whole record, those facts are clearly erroneous. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Parrott* v. *Colon*, 213 Conn. App. 375, 387, 277 A.3d 821 (2022).

A

The defendant first claims that "there was no evidence presented of a meeting of the minds or of mutual assent to the alleged contract's terms." The plaintiff responds that the court properly found that the defendant assented to the written agreement by accepting the plaintiff's services under the agreement and by failing to object to its terms. We agree with the plaintiff.

It is axiomatic that "to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties. . . . The mutual understanding must manifest itself by a mutual assent between the parties. . . . In other words, to prove the formation of an enforceable agreement, a plaintiff must establish the existence of a mutual assent, or a meeting of the minds . . . .

"The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were. . . . Whether the parties intended to be bound without signing a formal written document is an inference of fact [to be made by] the trial court . . . . [M]utual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." (Citations omitted; internal quotation marks omitted.) *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, 167 Conn. App. 36, 44–45, 145 A.3d 266 (2016).

Indeed, "[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined. . . . Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated." (Citation omitted; internal quotation marks omitted.) *Original Grasso Construction Co.* v. *Shepherd*, 70 Conn. App. 404, 411, 799 A.2d 1083, cert. denied, 261 Conn. 932, 806 A.2d 1065 (2002).

In the present case, the court found that the defendant manifested assent to the unsigned written agree-

ment by accepting the plaintiff's services under the agreement without objecting to its terms.[6] See, e.g., *Ullman, Perlmutter & Sklaver* v. *Byers*, 96 Conn. App. 501, 506, 900 A.2d 602 (2006) ("[o]ne enjoying rights is estopped from repudiating dependent obligations which he has assumed; parties cannot accept benefits under a contract fairly made and at the same time question its validity" (internal quotation marks omitted)). In so finding, the court credited the plaintiff's testimony that she discussed the services she would perform for the auction with George and Emanuel on January 26, 2012, that they agreed that her fee would be 1 percent of the gross auction proceeds, with a minimum payment of $30,000, and that she delivered to Emanuel a copy of the written agreement setting forth those terms on February 2, 2012. The court found that neither Emanuel nor George ever rejected the agreement nor attempted to make any changes to it and that, instead, they accepted the plaintiff's services as outlined in the agreement. Consequently, the court found that the defendant, acting through its principals, had assented to the written agreement.

The defendant nevertheless argues that, because the plaintiff's testimony establishes that she did not discuss the meaning of "gross auction proceeds" or a $10,000 payment that was due before the scheduled auction, the plaintiff failed to establish a "meeting of the minds necessary to form an enforceable contract."[7]

The problem with the defendant's argument is that the court found that the defendant assented to the *written* agreement by accepting the plaintiff's services as set forth in that agreement while failing to object to its terms. Indeed, the court found that, beginning on February 2, 2012, and "continuing thereafter, up to and through the date of the auction, the defendant observed and permitted all of the plaintiff's efforts to prepare for and accomplish [the] auction." Accordingly, the court's finding does not depend on whether every word in the agreement was discussed by the parties but, rather, on the parties' conduct after the plaintiff delivered the written agreement to Emanuel on February 2, 2012. The court's finding in this regard is supported not only by the plaintiff's testimony, but also by the documentary evidence, which included numerous emails between the plaintiff, the defendant's principals, and the defendant's employees, as well as the minutes from several weekly meetings held by the defendant in preparation for the auction. Thus, there is evidence in the record to support the court's finding that the defendant assented to the written agreement. Consequently, because the court found, on the basis of the parties' conduct after February 2, 2012, that the defendant assented to the written agreement and because that finding is supported by the evidence in the record, the defendant's claim fails.

B

The defendant next claims that, "[t]o the extent that the trial court has credited the plaintiff's obviously perjurious testimony, judicial estoppel should operate to prevent this." We disagree with the defendant's characterization of the plaintiff's testimony and conclude that the doctrine of judicial estoppel is inapplicable.

It is well established that "[t]he function of the appellate court is to review, and not retry, the proceedings of the trial court." (Internal quotation marks omitted.) *Housing Authority* v. *Stevens*, 209 Conn. App. 569, 580–81, 267 A.3d 927, cert. denied, 343 Conn. 907, 273 A.3d 234 (2022). As this court has explained, "[c]redibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Bayview Loan Servicing, LLC* v. *Gallant*, 209 Conn. App. 185, 192–93, 268 A.3d 119 (2021).

The defendant directs this court's attention to the following exchange between the court and the plaintiff:

"Q. So let me ask you a question while we are here: Did you discuss every one of the things [in the written agreement] with [Emanuel] before you gave him this document?

"A. I did not take detailed notes.

"Q. Did you tell him every one of these provisions before you gave him that document?

"A. Yes. We discussed in general what my responsibility is with the—

"Q. No, this is not in general. These are specifics, correct?

"A. Yes and no. For example—

"Q. Are there any specifics in here that—specifics as to what you would do? There are, right? There are specific items of what you're going to do, correct?

"A. Yes, there are, Your Honor.

"Q. And did you discuss each one of those with [Emanuel] before you handed him this contract?

"A. To the best of my recollection, yes. We did go over—

"Q. Every one of these?

"A. —how we would be preparing for the auction.

"Q. Every one of these items?

"A. To the best of my recollection, yes."

The defendant argues that "[t]his testimony was false and contrary to the plaintiff's testimony from the first trial. Under cross-examination, the plaintiff admitted that she had not discussed all the terms with the defendant's principals, or anyone else." The defendant claims that the following excerpt of the plaintiff's testimony from the present trial, which includes references to excerpts of her testimony from the first trial, contradicts her responses to the court's questions:

"[The Defendant's Counsel]: You said before that you didn't have a discussion of what gross auction proceeds meant?

"[The Plaintiff]: That is correct.

"[The Defendant's Counsel]: And do you recall this morning, when His Honor Judge Hiller asked you if you had discussed all of the terms in the exhibit 1 document with [Emanuel] and George, and you said you had?

"[The Plaintiff]: I said I believe I had, yes. I do recall.

"[The Defendant's Counsel]: And as you sit here today, do you remember when you testified in Stamford at the earlier trial of this matter that, when I asked you these kinds of questions, you admitted that you hadn't discussed many of the terms in the exhibit 1 document with George or [Emanuel] Dragone?

"[The Plaintiff]: I don't. I don't recall specifically.

"[The Defendant's Counsel]: If I showed you a document, you think it might refresh your recollection about your testimony then?

"[The Plaintiff]: I don't know, because it depends on the document. But I would be happy to look. . . .

"[The Defendant's Counsel]: Take a look at that document. Just take a look at that Ms. Downing, and let me know if that refreshes your memory at all about your prior testimony?

"[The Plaintiff]: I'm sorry, I'm no longer certain what the question is. I see where I say the last time I testified that I don't recall if we discussed the meaning of gross auction proceeds, so therefore I don't think we discussed every term that's in the contract. So I think my testimony is the same.

"[The Defendant's Counsel]: All right. So, as I mentioned, this morning [the court] asked you if you discussed all the terms that you put into the exhibit 1 document with [Emanuel] and George Dragone before you prepared it, and you said you believed you had. I asked you a few minutes ago if you discussed a certain number of terms, and you said you think you did but you can't recall because it's been seven years. So I said, why don't you take a look at this document and see if it refreshes your memory at all about your prior testimony. . . .

"[The Plaintiff]: Okay.

"[The Defendant's Counsel]: Does it refresh your memory about your prior testimony? . . .

"[The Plaintiff]: Yes, because I'm able to read it.

"[The Defendant's Counsel]: And if you turn to the second page of that document, starting on line 13 . . . . [Question:] 'When you had your meeting with [Emanuel] and George discussing your compensation, you discussed all the terms that you ended up incorporating into this document?' Answer: 'I don't know that we discussed all of the terms; we discussed what [our] plan and vision was for the auction.' Do you recall that testimony?

"[The Plaintiff]: I must have said it. But do I recall specifically verbatim, no. But I certainly trust that these are my words.

"[The Defendant's Counsel]: Do you have a different recollection of the meeting with [Emanuel] and George Dragone now than you did back at the [first trial]?

"[The Plaintiff]: No. I probably have less of one, since it's been another three years. I think I subconsciously am wavering in my head between terms and definitions. Because the terms of the arrangement were gross proceeds, what's going to be sold, who's responsible for what. In my head, I'm thinking definition is what we didn't discuss the—we didn't define the words of all of the terms, and I think that may be why I sound like I have a discrepancy. Because I did not see a need to define gross auction proceeds.

"The Court: Well, that's not all of the words. I asked you all of the terms in the contract.

"[The Plaintiff]: Right, and I—

"The Court: That means [two] pages of terms. I asked you if you discussed each of them with [George and Emanuel], and you said yes.

"[The Plaintiff]: And I recall the same.

"[The Defendant's Counsel]: Can I ask you to turn to, I think it's the fourth page of what you have there; it starts [on] page 90 at the top. Do you see where I asked you a question, line 6: 'Did you discuss that with them in their meeting,' and I'm referring to the minimum $10,000? Answer: 'We verbally talked on January 26, I should know that date by now.' 'Or thereabouts is the question.' Answer: 'That there would be one payment before the auction.' [Question:] 'Okay, and that payment would be in the amount of $10,000?'; that's my question. And your answer was: 'I don't recall if I specifically said $10,000.' Lines 13 and 14, do you see that?

"[The Plaintiff]: I do see it.

"[The Defendant's Counsel]: So, as you sit here today,

you remember whether you specifically discussed a $10,000 minimum payment with George or [Emanuel] Dragone on January 26, 2012?

"[The Plaintiff]: I cannot recall if I said $10,000 or we said the fail stop, or safe gap method. I no longer recall those specifics."

First, we read the plaintiff's testimony in response to the court's questioning as equivocal on the broad questions initially posed by the court and definitive only as to the court's question about "specifics as to what [the plaintiff] would do" pursuant to the agreement. More importantly, however, the defendant alerted the trial court to these alleged inconsistencies in the plaintiff's testimony, both during its cross-examination and in its posttrial brief, and the court nevertheless credited the plaintiff's testimony that the parties agreed to the essential terms of the contract and that the plaintiff memorialized those terms in the written agreement that she delivered to the defendant. Any alleged inconsistencies were fodder for the court's consideration. As the trier of fact, the court was "free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Benjamin* v. *Norwalk*, 170 Conn. App. 1, 25, 153 A.3d 669 (2016).

Accordingly, the doctrine of judicial estoppel simply is not implicated in the present case, and we decline to second-guess the court's credibility determination. See *Bayview Loan Servicing, LLC* v. *Gallant*, supra, 209 Conn. App. 192–93.

C

The defendant next claims that the written agreement "contains terms that are too ambiguous to meet the certainty requirements of an enforceable contract." More specifically, the defendant claims that the term " 'gross auction proceeds' " is ambiguous and "is not a term so common and well-defined as to be within the common knowledge of judges or juries." Therefore, according to the defendant, expert testimony was required to establish the meaning of " 'gross auction proceeds.' " The plaintiff responds that the defendant waived its claim regarding this alleged ambiguity by failing to raise it before the trial court. In its reply brief, the defendant offered no response regarding whether this claim was preserved. We conclude that the defendant did not raise this claim before the trial court and, therefore, we decline to review it.

"It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—

after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Canner* v. *Governor's Ridge Assn.*, *Inc.*, 210 Conn. App. 632, 653–54, 270 A.3d 694 (2022).

In the present case, although the defendant's counsel suggested myriad possible meanings of "gross auction proceeds" while cross-examining the plaintiff, the defendant neither requested that the court make a determination as to whether the term "gross auction proceeds" is ambiguous, nor advanced an alternative interpretation of it. Instead, the defendant denied agreeing to that term in any sense. In its posttrial brief, the defendant explained that "Emanuel and George . . . deny that the parties' relationship was governed by exhibit 1, deny that it accurately reflected their understanding of the terms of the plaintiff's engagement, and deny that exhibit 1 was ever even made known to them; both claim not to have ever seen the exhibit 1 document until many months after the plaintiff's engagement was already concluded; and both claim that the plaintiff was engaged at a flat rate of $2500 plus expenses to serve as the auctioneer." (Emphasis omitted.) As to the definition of "gross auction proceeds," the defendant contended that the plaintiff's testimony that she did not recall defining that term with Emanuel and George undermined her testimony that the defendant had assented to the written agreement.

On appeal, however, the defendant claims that the term "gross auction proceeds" is ambiguous and that expert testimony was necessary for the court to resolve the ambiguity. It argues: "*One possible explanation* for the trial court's imposition of the exhibit 1 compensation provision is that the . . . court simply accepted as fact the plaintiff's passing assertion that 'gross auction proceeds' is an industry term. This is improper." (Emphasis added.) The reason that the defendant is left to speculate as to a possible explanation for the court's construction of the compensation provision is that the defendant never raised this claim before the trial court. Consequently, the court never addressed it.

"Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). "This court also has explained that [a]n appellate tribunal cannot render a decision without first fully understanding the disposition being appealed. . . . Without the necessary factual and legal conclusions . . . any decision made by us respecting [the claims raised on appeal] would be entirely speculative." (Internal quotation marks omitted.) *R & P Realty*

*Co.* v. *Peerless Indemnity Ins. Co.*, 193 Conn. App. 374, 379, 219 A.3d 429 (2019). Consequently, because the defendant never raised its claim before the trial court, we decline to review it.

D

Next, the defendant claims that "[t]he court's finding that the plaintiff testified that she 'told [Emanuel] that she prepared an agreement' is a gross mischaracterization of the plaintiff's actual testimony and clearly erroneous." The defendant argues: "There was no testimony from the plaintiff that she ever—at any point in time— told anyone from the defendant company that she had prepared 'an agreement.' [Because] this testimony does not exist in the record, the court's reliance on it is a mistake." We are not persuaded.

In its decision, the court stated that the plaintiff testified that, on February 2, 2012, "the plaintiff brought the written agreement, told [Emanuel] that she prepared an agreement, held it up to show him, and then was told to place it on his desk." At trial, the plaintiff testified:

"[The Plaintiff's Counsel]: . . . Where did you meet on February 2?

"[The Plaintiff]: At the Westport office . . . .

"[The Plaintiff's Counsel]: . . . Did you present exhibit 1 to anyone at [the meeting]?

"[The Plaintiff]: I did. I mentioned to [Emanuel] that I had written down what we had discussed, and he said that I should put it on his desk in his office.

"[The Plaintiff's Counsel]: And did you do that?

"[The Plaintiff]: I did. . . .

"[The Defendant's Counsel]: And you say you prepared this for that meeting and [Emanuel] told you to put it on his desk. Did you hand it to him? Did he take it into his hands?

"[The Plaintiff]: I had tried, and he said to put it on his desk.

"[The Defendant's Counsel]: Okay. So, at the time, did you hold it up in front of him so he could read it?

"[The Plaintiff]: I believe, instead of how you displayed it, I think I said, 'Here is what I created. I wrote down what we discussed,' and he said, 'Put it on my desk in my office.' . . .

"[The Defendant's Counsel]: . . . So it's your testimony that from about four feet away, you held up this note and said: '[Emanuel], I wrote out what we discussed'; and he said, 'Put it on my desk?'

"[The Plaintiff]: That is correct."

The plaintiff's testimony and the rational inferences drawn therefrom unquestionably support the court's

statement, and we discern no error in the court's paraphrasing of the plaintiff's testimony. Simply put, the defendant ascribes undue significance to the court's choice of words and ignores the significance of the court's finding that the plaintiff delivered a copy of the written agreement to Emanuel on February 2, 2012. This finding did not depend on whether the plaintiff used the word "agreement" to describe the document she delivered to Emanuel but, rather, on her testimony that she delivered the document to him and communicated that the document reflected what they had discussed on January 26, 2012, i.e., the parties' agreement. Accordingly, the court's findings are supported by evidence in the record.

E

The defendant next claims that the court improperly "shifted the burden of proof to the defendant to prove that the 'written contract' had not been assented to by the defendant." We are not persuaded.

We begin with the applicable standard of review. "When a party contests the burden of proof applied by the trial court, the standard of review is de novo because the matter is a question of law." *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 455, 844 A.2d 836 (2004). "It is well settled that the party seeking to establish the existence of an enforceable contract bears the burden of proving a meeting of the minds between the parties." *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 271, 976 A.2d 750 (2009).

Although purporting to challenge the burden of proof applied by the trial court, the defendant's claim effectively challenges the court's factual findings and credibility determinations. The defendant argues that "the plaintiff has failed to provide the court with credible evidence to establish the formation of a written contract between the parties. She chose to call herself, the defendant's principals, and offer the transcript testimony of a former employee to establish her case. She produced multiple documents that have nothing at all to do with the issue of the terms of her compensation. There is not one person other than the plaintiff herself who had any knowledge of the [unsigned written agreement]. . . . Based on the total dearth of evidence presented by the plaintiff, it is clear that the trial court . . . impermissibly shifted the burden from requiring the plaintiff to prove a meeting of the minds to requiring the defendant to disprove a meeting of the minds." (Citation omitted.) In response, the plaintiff argues that the evidence that she presented at trial "is sufficient to prove the existence of a written contract" and that "[t]here is nothing in the [memorandum of] decision to indicate that [the court] ever shifted the burden of proof." We agree with the plaintiff.

As we have already concluded in part I A of this

opinion, the evidence presented to the trial court was sufficient to support the court's finding that the defendant assented to the written agreement. Although the defendant takes issue with the probative force of the evidence, "[t]his court will not reweigh the evidence or resolve questions of credibility . . . . It is within the province of the [trial court] to draw reasonable and logical inferences from the facts proven." (Citation omitted; internal quotation marks omitted.) *State* v. *Glenn*, 30 Conn. App. 783, 791, 622 A.2d 1024 (1993). Accordingly, we conclude that the court properly applied the law.

F

Finally, the defendant claims that, because "the parties have attached different meanings to the plaintiff's actions, there has been a legal misunderstanding that precludes enforcement of the document at issue." It argues that "there are no words or acts by the defendant . . . that indicate assent to the terms of [the written contract]." The defendant further argues that "the mere act of the plaintiff carrying out some work with respect to the auction cannot itself be viewed as evidence of assent by the defendant to the terms of the [written contract], since such acts could reasonably be viewed as work pursuant to the defendant's understanding of the terms of the plaintiff's engagement." We are not persuaded.

As noted previously in this opinion, "[w]hether the parties intended to be bound without signing a formal written document is an inference of fact [to be made by] the trial court . . . . [M]utual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." (Citation omitted; internal quotation marks omitted.) *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, supra, 167 Conn. App. 45. Also, as previously stated in this opinion, the court found that the defendant had assented to the written agreement on the basis of its findings that (1) the parties discussed the terms of the written agreement, (2) the plaintiff delivered to Emanuel a copy of the written agreement, (3) the plaintiff performed pursuant to that written agreement, and (4) the co-owners of the defendant observed and permitted all of the work performed by the plaintiff as set forth in the written agreement. As we held in part I A of this opinion, these findings are supported by the evidence in the record.

In support of its claim to the contrary, the defendant again characterizes the evidence presented as not "credible" and posits that the parties' conduct after February 2, 2012, is consistent with the defendant's understanding of the arrangement. The court, however, found otherwise. The parties offered two very different accounts of the underlying events, and the court determined that the plaintiff's version of events was more credible than

the defendant's version. Specifically, the court found that the defendant's claim that it agreed to pay the plaintiff $2500 plus expenses to call the auction was not credible. See, e.g., *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, supra, 167 Conn. App. 46–47 ("[t]he existence of a hidden or subjective intent on the part of one party to a contract does not render a finding of mutual assent clearly erroneous"). Again, we reiterate what has become a tired refrain: "Because it is the sole province of the trier of fact to assess the credibility of witnesses, it is not our role to second-guess such credibility determinations." *State* v. *Franklin*, 115 Conn. App. 290, 292, 972 A.2d 741, cert. denied, 293 Conn. 929, 980 A.2d 915 (2009). In sum, we conclude that the court's finding that the written agreement was an enforceable contract is supported by the evidence in the record.

## II

Last, the defendant claims that the court improperly admitted "hearsay evidence" on the issue of damages. Specifically, the defendant claims that exhibits 5 and 57 "are inadmissible hearsay . . . ." The following additional facts are relevant to the defendant's claim.

At trial, the plaintiff offered exhibit 5, a table prepared by the plaintiff that listed the cars sold at the auction and the prices for which they sold. The plaintiff testified that she obtained that information from the defendant's website. The defendant objected, claiming that the document was inadmissible hearsay. When the court inquired whether the information constituted a statement of a party opponent, the defendant's counsel questioned whether the information was accurate or could be identified as coming from the defendant's website. In response, the plaintiff's counsel stated that he would authenticate the document through the testimony of Emanuel. After Emanuel testified that the auction results had been reported on the defendant's website, the court admitted exhibit 5 as a full exhibit.

The plaintiff also offered exhibit 57, a copy of the auction results as reported on the website www.liveauctioneers.com. The plaintiff testified that the website is "a platform to hold an auction concurrently on the Internet, so your bidding is [open] to anybody in the world while the auction is physically happening at a location." After the plaintiff testified that the results of the auction are reported on the website after each item is sold and that she had printed the document from the website on September 25, 2019, the plaintiff's counsel offered the document as a full exhibit. The defendant's counsel then interjected and proceeded to question the plaintiff:

"[The Defendant's Counsel]: I would like to examine her, Your Honor.

"The Court: You bet.

"[The Defendant's Counsel]: Ms. Downing, can you look at the—when you print[ed] that document off the Internet . . . last night, you were at a certain website?

"[The Plaintiff]: Liveauctioneers.com.

"[The Defendant's Counsel]: Yes or no—

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: —you were at a certain website?

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: Okay. And that website, when you print the document that you have there in front of you, does it get printed, the website you were at, on the document?

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: Okay. And what is the web address for that document?

"[The Plaintiff]: www.liveauctioneers.com.

"[The Defendant's Counsel]: And then there's a strain of other information?

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: Okay. That's not Dragoneclassicmotorcars.com, or anything like that, is it?

"[The Plaintiff]: This document, no. This document is from [www.liveauctioneers.com].

"[The Defendant's Counsel]: Is it your testimony that [the defendant] controls [www.liveauctioneers.com]?

"[The Plaintiff]: No, of course not.

"[The Defendant's Counsel]: Okay. Is it your testimony that—well, let me ask you this. For that auction, who was in charge of putting information—giving information to liveauctioneers.com?

"[The Plaintiff]: A woman named Tammy Sikowsky was hired, because she—a woman named Tammy Sikowsky.

"[The Defendant's Counsel]: Okay. Who hired her?

"[The Plaintiff]: I did.

"[The Defendant's Counsel]: Okay. And are you telling us that she put that information into [www.liveauctioneers.com]?

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: You're aware of that?

"[The Plaintiff]: Yes. She did it during the auction on May 19, 2012.

"[The Defendant's Counsel]: Okay. You had access to the liveauctioneers.com service, didn't you?

"[The Plaintiff]: Anybody does. It's a free service.

"[The Defendant's Counsel]: Okay. Anybody can go in there and put what they think the auction results were, isn't that right?

"[The Plaintiff]: No, that's not what I was saying. Anybody can buy—you can participate in a Live Auctioneer—in a live auction through [www.liveauctioneers.com], but you have to be [registered] with the company in order to run a live auction.

"[The Defendant's Counsel]: Okay. But you didn't put the information into [www.liveauctioneers.com] as reported on that website, did you?

"[The Plaintiff]: No, I was calling the auction.

"[The Defendant's Counsel]: I understand that. The information that is reproduced in . . . that exhibit, you didn't prepare that information and put it on that website?

"[The Plaintiff]: Other than print it last night, no.

"The Court: Now, let me ask a question. The person you hired to call those numbers in, she was working for you?

"[The Plaintiff]: She was paid by [the defendant].

"The Court: Paid by [the defendant].

"[The Plaintiff]: She came the day of the auction to do this.

"The Court: So, she became—she became an agent of [the defendant] working to put that information in?

"[The Plaintiff]: Yeah. She was hired to be the Live Auctioneers' person at the auction.

"The Court: And she was paid by [the defendant]?

"[The Plaintiff]: Yes.

"[The Defendant's Counsel]: She was paid by [the defendant], but you picked her, isn't that right?

"[The Plaintiff]: She is a person that I and other auctioneers throughout Connecticut use when we run a sale on [www.liveauctioneers.com].

"[The Defendant's Counsel]: Okay. Let me ask you— never mind. . . . I object, Your Honor. She—

"The Court: You might as well forget it, because it's coming in. . . .

"[The Defendant's Counsel]: Well, that's fine.

"The Court: All right.

"[The Defendant's Counsel]: I mean isn't it—I just want to put an objection on the record, Your Honor.

"The Court: Yeah, your objection is heard and overruled, okay. It's on the record.

"[The Defendant's Counsel]: Just lack of foundation is all—

"The Court: You got it.

"[The Defendant's Counsel]: —I would like to say.

"The Court: You got it. No problem. Okay. Go ahead.

"[The Plaintiff's Counsel]: Thank you. With that, Your Honor, the plaintiff rests.

"The Court: All right. Do you have questions for [the plaintiff]?

"[The Defendant's Counsel]: I don't have any questions for her, Your Honor.

"The Court: Okay. You may step down. We want [exhibit 57 marked as a full exhibit]. All right. Did you want to tell me what is important in here that you offered it for?

"[The Plaintiff's Counsel]: Your Honor, there was some discussion about the prices that were listed on the exhibit 5 and the fact that they . . . include the buyer's premium, as opposed to just the hammer price. These, Your Honor, are just the hammer price.

"The Court: Okay. Hammer price. And have you added those up?

"[The Plaintiff's Counsel]: I have not, Your Honor, but I will.

"The Court: Okay.

"[The Plaintiff's Counsel]: It also includes the memorabilia, which are not listed on exhibit 5.

"The Court: Gotcha. Okay. Thank you."

On appeal, the defendant challenges the admission of both exhibits 5 and 57. We conclude that the court properly admitted exhibit 57 into evidence and that, assuming, without deciding, that the court improperly admitted exhibit 5 into evidence, the defendant has failed to demonstrate that the court's ruling was harmful.

Before considering the court's ruling as to exhibit 57, we first clarify the defendant's claim on appeal. Although the defendant refers to both exhibits 5 and 57 as inadmissible hearsay, its argument on appeal focuses on authentication. Specifically, the defendant argues that the "plaintiff testified that she knows the third party who put the information on that website, and named the person, but that person was never produced by the plaintiff *to authenticate the website* nor to explain the source of the information contained within the printout and/or the origin of the figures reported as the auction sales. . . . To support the admission of [exhibit 57], the plaintiff did not produce a witness from the defendant *to authenticate* the website.

"Simply put, the plaintiff's naked submission of information from third-party websites *without any authentication* is contrary to the Code of Evidence." (Citation omitted; emphasis added.) The defendant then sets forth two quotations about authentication pursuant to § 9-1 (a) of the Connecticut Code of Evidence, before stating that "the plaintiff failed to offer evidence *to authenticate the information* she claims to have obtained from the Internet and offered no evidence to overcome the exhibits' hearsay nature. Other than these hearsay exhibits, the plaintiff produced no evidence to prove the amount of her damages. The *trial court's rulings allowing these unauthenticated exhibits are erroneous.*" (Emphasis added; footnote omitted.)

Because the substance of the defendant's argument on appeal focuses on the authentication, or lack thereof, of exhibit 57, we construe its claim as challenging the admission of exhibit 57 on the ground that the plaintiff failed to make an adequate prima facie showing of the authenticity of the document. Nevertheless, because its brief is not a model of clarity as to this claim, to the extent the defendant claims that the court improperly admitted exhibit 57 because it is inadmissible hearsay, we conclude that this aspect of the defendant's claim is not adequately preserved and decline to review it.

At trial, the defendant's counsel did not assert hearsay as a ground for the objection to exhibit 57. Instead, as previously set forth in this opinion, counsel noted that he wanted to make his objection for the record and stated: "Just lack of foundation is all . . . I would like to say." It is well established that "[t]his court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 408 n.18, 902 A.2d 1044 (2006). Consequently, because the defendant did not object to the admission of exhibit 57 on the grounds that it is inadmissible hearsay, we decline to review that claim on appeal.

Having clarified the defendant's preserved claim, we now set forth the applicable standard of review and

relevant legal principles. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *Customers Bank* v. *Tomonto Industries, LLC*, 156 Conn. App. 441, 445, 112 A.3d 853 (2015).

"The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a).

"The requirement of authentication applies to all types of evidence, including . . . electronically stored information . . . . The category of evidence known as electronically stored information can take various forms. It includes, by way of example only, e-mails, Internet website postings, text messages and chat room content, computer stored records and data, and computer generated or enhanced animations and simulations. As with any form of evidence, a party may use any appropriate method, or combination of methods . . . or any other proof to demonstrate that the proffer is what the proponent claims it to be, to authenticate any . . . electronically stored information. . . .

"Both courts and commentators have noted that the showing of authenticity is not on par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the [fact finder], [who] will ultimately determine its authenticity. . . .

"[T]he bar for authentication of evidence is not particularly high. . . . [T]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be . . . . In addition, [a]n electronic document may . . . be authenticated by traditional means such as direct testimony of the purported author or circumstantial evidence of distinctive characteristics in the document that identify the author." (Internal quotation marks omitted.) *State* v. *Papineau*, 182 Conn. App. 756, 788–89, 190 A.3d 913, cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018).

In the present case, the plaintiff's testimony tends to demonstrate that (1) the website www.liveauctioneers.-

com provides a platform for hosting auctions over the Internet, (2) the defendant paid a third party to report the results of the defendant's auction on www.liveauctioneers.com, (3) the third party in fact reported the results of the auction as it occurred on May 19, 2012, (4) exhibit 57 is a copy of the results as reported on www.liveauctioneers.com that the plaintiff printed the night before she testified, and (5) the name of the website was printed on the document. Thus, the plaintiff's testimony constituted a sufficient prima facie showing that exhibit 57 was what the plaintiff claimed it to be. See Conn. Code Evid. § 9-1 (a). Accordingly, we conclude that the court properly admitted it into evidence over the defendant's challenge to it.

Finally, as to the admission of exhibit 5, which, like exhibit 57, identified the cars sold at the auction and the prices for which they sold, we conclude that, even if we assume that exhibit 5 improperly was admitted, that evidentiary ruling was harmless.

It is well established that, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . [A]n [improper] evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the [result]. . . . A determination of harm requires [the reviewing court] to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial." (Citation omitted; internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254–55, 9 A.3d 364 (2010).

In the present case, the defendant does not address expressly the harmfulness of the court's evidentiary rulings and, instead, claims that, "[o]ther than these hearsay exhibits, the plaintiff produced no evidence to prove the amount of her damages." Importantly, although both exhibits include a list of the cars sold at the auction and the prices for which they sold, the defendant fails to address whether one exhibit has greater significance than the other. We note, however, that the plaintiff, in her posttrial brief, relied on exhibit 57—not exhibit 5—to establish her damages under the contract. Specifically, in her principal posttrial brief, the plaintiff argued that, "[a]s to the proceeds of the auction, [the plaintiff] maintains that exhibit 57, which represents [the defendant's] report to the classic car community, *is the most trustworthy evidence of the auction's proceeds*." (Emphasis added.) The plaintiff again relied on exhibit 57 in calculating her damages, stating that "[t]he damages to which the plaintiff is entitled are as follows: $41,673.20 per the contract (See exhibits 1 and 57)," and the court awarded the plaintiff damages in that amount. Indeed, the plaintiff never

referenced exhibit 5 in either of her posttrial briefs, and the court made no reference to that exhibit in its decision.

Consequently, because we have concluded that exhibit 57 properly was admitted into evidence and because the plaintiff relied on exhibit 57 to establish her damages, we have a fair assurance that the allegedly improper admission of exhibit 5 did not affect the result of the trial, and the defendant has failed to demonstrate otherwise. See, e.g., *State* v. *Durdek*, 184 Conn. App. 492, 504–505, 195 A.3d 388 (before being entitled to new trial, appellant must prove existence of both erroneous ruling and resulting harm), cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018). Accordingly, assuming, without deciding, that exhibit 5 improperly was admitted, we conclude that its admission was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The named defendant, Emanuel Dragone (Emanuel), is not participating in this appeal. Accordingly, all references to the defendant in this opinion are to Dragone Classic Motorcars, Inc. We note that Emanuel's first name has been spelled inconsistently in various court documents as Emanuel and Emmanuel.

[2] The compensation provision provides: "As compensation for the above duties, I require 1 [percent] of the gross auction proceeds, with a minimum payment of $30,000. I would like [one-third] of the minimum, $10,000, to be paid by April 1st, 2012. The remaining balance is due within [ten] days [after] the auction which is May 22, 2012."

[3] The agreement provided that the plaintiff, as auction consultant, would "provide all of the necessary information, training and support for the auction" and would perform the following tasks and services: (1) "[s]et up [the defendant] with Auction Flex, a comprehensive auction database management system," (2) work with the defendant's technology team to establish data and voice technology for conducting the auction and to create an Internet catalog to run the auction live over the Internet, (3) "[s]pear-head marketing efforts" with the defendant's in-house marketing team, (4) train staff how to use the auction database management system, (5) "[a]dvise, and if requested, create the mandatory forms required to run an auction," (6) "[m]ap-out and direct the layout of the physical auction," and (7) "[c]onduct the actual auction . . . ."

[4] In April, 2016, Attorney Jeffrey R. Hellman filed an appearance on behalf of the plaintiff and has continued to represent the plaintiff in this matter since that date.

[5] The plaintiff asserted the same claims against Emanuel, but the court found "no basis for personal liability on the part of [Emanuel] because he acted at all times in his corporate capacity on behalf of the [defendant]."

[6] The defendant also argues that the court improperly found that a written contract existed between the parties because the plaintiff did not plead that an oral or implied contract existed. The defendant appears to suggest that because the plaintiff alleged the existence of a written contract, the court was foreclosed from finding that an implied contract exists. We are not persuaded.

"The term 'implied contract' . . . often leads to confusion because it can refer to an implied in fact contract or to an implied in law contract. An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties. . . . On the other hand, an implied in law contract is not a contract, but an obligation . . . . It is based on equitable principles to operate whenever justice requires compensation to be made." (Citation omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573–74, 898 A.2d 178 (2006).

In the present case, the plaintiff alleged that "[a] written contract outlining [her] obligations and compensation was given to [the defendant and Emanuel]" and that she performed her duties as outlined in the contract. At trial, she argued that the defendant assented to the written agreement by failing

to object over the course of several months as the plaintiff performed her obligations under that contract. This is precisely what the court found transpired. Because the court found that the defendant did not express its assent to the written contract in words but, rather, through its conduct, the court found that the written agreement was an implied in fact contract. See *Vertex, Inc.* v. *Waterbury*, supra, 278 Conn. 573–74. Accordingly, because a "written contract" can be either a signed, express contract or an unsigned, implied in fact contract, we disagree with the defendant's contention that the plaintiff's allegations in her complaint precluded the court's finding that an implied in fact contract existed.

[7] The defendant relies on two excerpts from the plaintiff's testimony. First, as to the meaning of "gross auction proceeds," the plaintiff testified:

"[The Defendant's Counsel]: . . . I'm asking you for your understanding of what gross auction proceeds means; specifically, when you put it in the exhibit 1 document, what did you mean by gross auction proceeds?

"[The Plaintiff]: I meant the sum of the hammer prices that we sold at the auction.

"[The Defendant's Counsel]: So, not including the buyer's premium?

"[The Plaintiff]: Correct.

"[The Defendant's Counsel]: Not including sales tax?

"[The Plaintiff]: That is also correct.

"[The Defendant's Counsel]: And not including a seller's premium?

"[The Plaintiff]: I'm not sure what that is, but correct; it does not include that.

"[The Defendant's Counsel]: Okay. And did you discuss at your meeting in January of 2012 with [Emanuel] and George prior to preparing exhibit 1 whether the 1 percent of gross auction proceeds that you were to receive was going to include the buyer's premium, or the sales tax, or the seller's premium? Exactly what the specifics of what the gross auction proceeds meant?

"[The Plaintiff]: I do not believe so, because it's an accepted—you couldn't possibly expect to be paid on sales tax collected, because that's never your income; it's passed through to the entity to which it's owed. But I cannot recall having to clarify what that is.

"[The Defendant's Counsel]: So you didn't have a discussion with them about what gross auctions proceeds meant before you wrote up this document?

"[The Plaintiff]: As far as I can recollect, no."

Second, as to the $10,000 payment, the plaintiff testified:

"[The Defendant's Counsel]: It's true, isn't it, that you never discussed the $10,000 minimum payment with [Emanuel] or George, isn't that right?

"[The Plaintiff]: After I—*it was discussed on January 26, [2012], so I can't say it was never discussed.* It is true that [it] was [not] discussed after that. To the best of my recollection, I don't think we did.

"[The Defendant's Counsel]: But on January 26, [2012], you did discuss the $10,000 minimum payment?

"[The Plaintiff]: I think so. It's seven and a half years now. I cannot say with philosophical certainty that it was discussed, but I imagine it would have been." (Emphasis added.)

We note that, insofar as the plaintiff's testimony is ambiguous on these points, the court, as the trier of fact, was "free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Benjamin* v. *Norwalk*, 170 Conn. App. 1, 25, 153 A.3d 669 (2016).